

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### AP-75,358

---

**JOE LUNA, Appellant**

**v.**

**THE STATE OF TEXAS**

---

### ON DIRECT APPEAL
### FROM CAUSE NO. 2006-CR-0033 IN THE 379ᵀᴴ DISTRICT COURT
### BEXAR COUNTY

---

      **PRICE, J., delivered the opinion for a unanimous Court. HERVEY, J., filed a concurring opinion in which WOMACK and JOHNSON, JJ., joined.**

### O P I N I O N

      The appellant was convicted in March 2006, of capital murder.[1] The appellant pleaded guilty in front of the jury, and based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial

---

[1] TEX. PENAL CODE § 19.03(a).

judge sentenced the appellant to death.[2]  Direct appeal to this Court is automatic.[3]  After

reviewing the appellant's twenty-five points of error, we find them to be without merit.

Consequently, we affirm the trial court's judgment and sentence of death.

In the appellant's first point of error, he contends that the trial court "erred in

conducting an unauthorized *ad hoc* proceeding which failed to provide a separate sentencing

process as required by statute."  In his second point of error, he asserts that the trial court

"erred in conducting an unauthorized procedure which failed to provide a properly bifurcated

trial in violation of the Eighth and Fourteenth [A]mendments to the United States

Constitution."

At the commencement of the trial on the merits, the trial court read the indictment and

the appellant pleaded guilty in the presence of the jury.  The trial court then excused the jury

and admonished the appellant of the consequences of his plea.  The parties also discussed

how to proceed, concluding as follows:

> THE COURT:  [W]hat I plan to do is bring the jury back in, instruct them that you have entered a plea of guilty to the offense of capital murder. I will then move into the punishment phase of the trial.  I guess it's a combination of punishment slash guilt-innocence.  There will not be a jury charge until we conclude this phase.  Upon the conclusion of all the evidence, I will give them a charge that instructs them to find you guilty.  And that charge will also include the special issues that they will be required to answer. So this phase of the trial will include evidence from both the indicted case and

---

[2] Art. 37.071, § 2(g).  Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

[3] Art. 37.071, § 2(h).

any extraneous matters.
Anything else?

[PROSECUTOR]: Your Honor, may the record reflect that we have conferred with counsel outside -- well, with the Court as to the procedure in reference to the submission of the charge, of the direction of the verdict of guilty, as well as the questions to be asked, to be done in a unified fashion in one verdict form, and one charging instrument, and that is agreeable to the parties?

THE COURT: Okay.

[DEFENSE COUNSEL]: It is agreeable, Judge.

THE COURT: All right. Anything else before we get started?

I propose we bring the jury in and I'll instruct them that he has entered a plea of guilty and we'll move right into the evidence.

The trial court then recalled the jury and reiterated that the appellant had pleaded guilty to the indictment. The trial court explained that the parties would present evidence on both guilt and punishment and then the jury would receive a "charge that instructs you what to do as it relates to both phases of the trial." After the parties presented evidence, the trial court first read the jury charge on guilt/innocence. The jurors deliberated on guilt/innocence and returned a verdict finding the appellant guilty of capital murder as charged in the indictment. The trial court then read the punishment charge and the parties made closing arguments. The jurors deliberated on punishment and the trial court sentenced the appellant to death based on their answers to the special issues on the verdict form.

The appellant argues that Article 37.071 mandates a bifurcated proceeding in a capital case. He relies on the version of the statute in effect at the time he committed the offense,

which states in pertinent part:

> If a defendant is tried for a capital offense in which the state seeks the death penalty, on a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment.[4]

The appellant complains that the jury in the instant case "received no clear instruction as to the necessity of mentally separating the two considerations of guilt and sentencing," that these issues were presented to the jury "in close temporal proximity," and that, as a result, "the jury may all too easily have misunderstood its role" and "assumed that a negative outcome for [the appellant] was dictated twice over." He acknowledges that a bifurcated proceeding is not "constitutionally mandated," but argues that it should be. He also asserts that, because bifurcated proceedings are mandated by Article 37.071, there is a "constitutionally cognizable due process interest in such a proceeding."

We decline to hold that bifurcated proceedings are statutorily or constitutionally mandated. In *Holland v. State,* we rejected the argument that Article 37.071 mandates a bifurcated proceeding in capital cases.[5] As we stated in *Williams v. State*:

> [T]he plea of guilty before a jury essentially becomes a trial on punishment since entry of a plea of guilty before a jury establishes a defendant's guilt except where evidence demonstrates his innocence. (Citations omitted). The introduction of evidence is not to determine guilt but is to enable the jury to

---

[4] TEX CODE CRIM. PROC. art. 37.071, § 2(a)(1) (Vernon 2001).

[5] 761 S.W.2d 307, 312-14 (Tex. Crim. App. 1988).

intelligently exercise discretion in determining the appropriate punishment.[6] Further, as we recently held in *Fuller v. State,* once a defendant pleads guilty to a jury, "[t]he case simply proceeds with a unitary punishment hearing."[7] Points of error one and two are overruled.

In points of error three and four, the appellant claims that the trial court denied him due process and violated Article 46B.004 when it failed to conduct an "adequate" inquiry on the issue of his competency. In points of error five and six, the appellant argues that the trial court denied him due process and violated Article 26.13 when it accepted his guilty plea without an "adequate" competency inquiry.[8]

A person is incompetent to stand trial if he lacks (1) a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against him.[9] Either party may suggest by motion, or the trial court may suggest on its own motion, that the defendant may be incompetent to stand trial.[10] If evidence suggesting that the defendant may be incompetent

---

[6] 674 S.W.2d 315, 318 (Tex. Crim. App. 1984).

[7] 253 S.W.3d 220, 227 (Tex. Crim. App. 2008).

[8] Article 26.13(b) provides that no guilty plea shall be accepted by the trial court unless it appears that the defendant is mentally competent and the plea is free and voluntary.

[9] Art. 46B.003.

[10]

(continued...)

to stand trial comes to the attention of the trial court, then the trial court on its own motion shall suggest that the defendant may be incompetent to stand trial.[11] On suggestion that the defendant may be incompetent to stand trial, the trial court shall determine by "informal inquiry" whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial.[12]

The trial court inquired about the appellant's competency several times during the proceedings. When the appellant initially pleaded guilty to the charges in the indictment, the trial court admonished him of the consequences of his plea. The appellant stated that he understood the admonishments, that his plea was not the result of threats or promises, and that he was satisfied with the assistance of defense counsel. The trial court asked defense counsel if the appellant had "a rational and factual understanding of the proceedings," if he was "able to assist in the preparation of any possible defenses," and if he was "mentally competent" to waive his rights and enter a guilty plea. Defense counsel replied to all of these questions in the affirmative.

The appellant later testified at trial, against the advice of defense counsel. Outside the presence of the jury, defense counsel questioned the appellant about his decision to testify

---

[10](...continued)
  Art. 46B.004(a).

[11]
  Art. 46B.004(b).

[12]
  Art. 46B.004(c).

and his awareness of the consequences of doing so. The appellant repeatedly indicated an understanding of the consequences of his decision to testify. The trial court asked defense counsel if he believed that the appellant had "a rational and factual understanding of the proceedings" and was "mentally competent" to waive his Fifth Amendment rights and to testify in front of the jury. Defense counsel replied in the affirmative. The trial court also questioned the appellant, who said that he understood his Fifth Amendment right not to testify and the consequences of waiving that right. He also acknowledged that no one threatened him or coerced him to testify.

The trial court again inquired about the appellant's competency prior to closing arguments, when the appellant consented to the seating of an alternate juror.[13] Defense counsel stated that he was not in favor of seating the alternate juror because she was, in his opinion, "extremely pro-death sentence." The trial court then questioned defense counsel and the appellant as follows:

> THE COURT: [Defense counsel], are you confident that your client -- I've asked this before, but as to this issue -- has a rational and factual understanding of the issues we're dealing with this morning?
>
> [DEFENSE COUNSEL]: He does. There's no doubt about that. I think Doctor Skop has testified, also, as to his mental condition.
>
> THE COURT: And in your opinion is he mentally competent at this time to be able to make that type of a decision?

---

[13] The alternate juror was never actually seated on the jury. The juror she was going to replace was feeling ill, but was able to continue his jury service.

[DEFENSE COUNSEL]:  Yes, he is.

&ast;   &ast;   &ast;

THE COURT: Right. [Appellant], do you understand everything we've done up here?

[APPELLANT]:  I understand.

THE COURT: Do you have any questions about anything we've gone over?

[APPELLANT]: No.

THE COURT: Were you able to effectively communicate with your attorney this morning regarding not only the issue of the lawyer -- or the juror's being ill this morning, but the issues related to the alternate and her feelings on the death penalty?

[APPELLANT]: I did.

THE COURT: Do you have any questions?

[APPELLANT]: No.

The appellant complains that the trial court's informal inquiry into his competency was "inadequate."  He asserts that the trial court "failed entirely to make any meaningful inquiry beyond this cursory questioning which elicited brief answers."  He argues that more was required in this case, given his sudden and irrational decisions to plead guilty and "to ask for death."  He argues that the trial court should have ordered a psychiatric examination and should have sought information about his current mental-health status from jailers or others

who knew him. However, this is not necessarily required in an "informal inquiry."[14]

In this case, defense counsel expressed his opinion several times that the appellant was competent to stand trial. The appellant repeatedly stated in response to questioning by the trial court that he understood the consequences of his decisions to plead guilty, to testify before the jury, and to consent to the seating of an alternate juror. It also appears from the appellant's testimony before the jury that he made these choices after thought and deliberation. He explained that he wanted to "turn my life over to God," "to set it straight" for the victim's family, and to "give them justice for what I did." He said, "I don't see myself spending the rest of my life in prison," and that if he were sentenced to death then he "would be able to focus [his] attention on getting strengthened spiritually and not be sidetracked." He further testified that he made his decision "quite a while back" and that it "isn't a spur of the moment thing that I'm doing." This was also confirmed by defense witness Dr. Brian Perry Skop, a psychiatrist who evaluated the appellant and testified regarding future dangerousness. When defense counsel asked Dr. Skop why he thought the appellant was requesting the death penalty, he replied:

> Well, I met with him before my testimony today to discuss that. Because it was a change in his defense strategy since I met with him back in January, at least what he expressed to me. And basically . . . it doesn't appear that he's suffering from a major depression or anything, or he's suicidal. It's basically

---

[14]

*See, e.g., Lawrence v. State,* 169 S.W.3d 319, 328 n.1 (Tex. App.—Fort Worth 2005, pet. ref'd)(declining to mandate these actions as part of an informal inquiry, but holding that "they do constitute useful, nonexclusive sources of information available to the trial court in making such an inquiry.").

a decision that he's made that he would rather receive the death penalty than
be in prison for the rest of his life, or the majority of his life.

After reviewing this evidence, we cannot say that the trial court abused its discretion by failing to conduct further inquiry into the appellant's competency. Points of error three, four, five, and six are overruled.

In points of error seven, eight, nine, and ten, the appellant complains that the jury charge allowed him to be convicted on less than an unanimous jury verdict, which he claims violated his statutory and constitutional rights and deprived him "of the right to a jury finding beyond a reasonable doubt on the fact used to increase his penalty."[15] The appellant pleaded guilty to an indictment that contained three separate paragraphs within a single count:

## COUNT I
## PARAGRAPH A

on or about the 17th Day of February, 2005, JOE LUNA, hereinafter referred to as defendant, did intentionally cause the death of an individual, namely: MICHAEL PAUL ANDRADE, by STRANGLING MICHAEL PAUL ANDRADE WITH A DEADLY WEAPON, NAMELY: A LIGATURE AND AN OBJECT UNKNOWN TO THE GRAND JURORS, THAT IN THE MANNER OF ITS USE AND INTENDED USE WAS CAPABLE OF CAUSING DEATH AND SERIOUS BODILY INJURY, and the defendant was in the course of committing and attempting to commit the offense of BURGLARY upon MICHAEL PAUL ANDRADE;

## PARAGRAPH B

on or about the 17th Day of February, 2005, JOE LUNA, hereinafter referred to as defendant, did intentionally cause the death of an individual, namely:

---

[15]  *Ngo v. State,* 175 S.W.3d 738 (Tex. Crim. App. 2005); *Ring v. Arizona,* 536 U.S. 584 (2002); *Apprendi v. New Jersey,* 530 U.S. 466 (2000); *Schad v. Arizona,* 501 U.S. 624 (1991).

MICHAEL PAUL ANDRADE, by STRANGLING MICHAEL PAUL ANDRADE WITH A DEADLY WEAPON, NAMELY: A LIGATURE AND AN OBJECT UNKNOWN TO THE GRAND JURORS, THAT IN THE MANNER OF ITS USE AND INTENDED USE WAS CAPABLE OF CAUSING DEATH AND SERIOUS BODILY INJURY, and the defendant was in the course of committing and attempting to commit the offense of ROBBERY upon MICHAEL PAUL ANDRADE;

PARAGRAPH C

on or about the 17th Day of February, 2005, JOE LUNA, hereinafter referred to as defendant, did intentionally cause the death of an individual, namely: MICHAEL PAUL ANDRADE, by STRANGLING MICHAEL PAUL ANDRADE WITH A DEADLY WEAPON, NAMELY: A LIGATURE AND AN OBJECT UNKNOWN TO THE GRAND JURORS, THAT IN THE MANNER OF ITS USE AND INTENDED USE WAS CAPABLE OF CAUSING DEATH AND SERIOUS BODILY INJURY, and the defendant was in the course of committing and attempting to commit the offense of ARSON upon MICHAEL PAUL ANDRADE[.]

The trial court instructed the jury "to find the defendant guilty of this offense as charged in the indictment." The jury returned a general verdict finding the appellant "guilty of capital murder as charged in the indictment."

The appellant pleaded guilty to an indictment that alleged alternative theories of committing the same offense. The jury's general verdict did not violate the unanimity requirement under these circumstances.[16] Points of error seven, eight, nine, and ten are overruled.

In point of error eleven, the appellant claims that the trial court erred "in failing to

---

[16] *See Kitchens v. State,* 823 S.W.2d 256, 258 (Tex. Crim. App. 1991)(upholding general verdict for one offense with varying theories of commission).

suppress items found during a search of the apartment where [the appellant] was an overnight guest, when the police had no warrant, no consent from [the appellant] and no other valid exception to the Fourth Amendment existed to justify their action." In reviewing a trial court's ruling on a motion to suppress, we give almost total deference to a trial court's determination of historical facts, and we review *de novo* the trial court's application of the law.[17]

Detective April Titus testified at the suppression hearing that police received a Crime Stoppers tip naming the appellant as a suspect. The caller indicated that the appellant had used his girlfriend Maria's apartment to access the victim's apartment through their shared attic crawl space. The caller stated that the appellant could be found at Maria's apartment or at his sister's residence.

Titus spoke to a maintenance man at the victim's apartment complex after police received the Crime Stoppers tip. She showed him a photograph of the appellant, whom he recognized as a person who had been "coming and going" from apartment 1002. Titus then spoke to the manager and discovered that apartment 1002 was leased to Maria Solis. Two other officers went to Solis's place of employment to see if she would willingly talk to them and give a statement. Solis then went to Titus' office, where she signed a written consent form for police to search her apartment. Solis told Titus that the appellant had spent the previous night at her apartment and that he was still there. She stated that the appellant told

---

[17] *Rayford v. State,* 125 S.W.3d 521, 528 (Tex. Crim. App. 2003).

her that he had entered the victim's apartment through the crawl space and that he had intended to steal from the victim. He explained that the victim saw him, so he "did what he had to do" to keep police from coming after Solis and taking her child away. Solis stated that the appellant had some clothing and other items at her apartment. When Titus asked Solis if the appellant lived with her and if he kept a toothbrush at her apartment, she answered both questions "no." Solis stated that the appellant stayed with her "on and off" and that "she had both sets of keys to her apartment."

The appellant later told Titus that "he was living at his sister's home." When the appellant completed a "statement information supplement" form, he provided his sister's name and address in the section asking for information on his nearest relative, but he wrote down a different location as his home address. He was not listed on the lease for Solis' apartment.

The trial court denied the appellant's motion to suppress, stating as follows:

> THE COURT: Okay. The ruling on this issue is looking at both of the exhibits that have been introduced, specifically Exhibit Number 1, deals with the issue of standing. Exhibit Number A[18] deals with the issue of whether or not there was lawful consent to enter the premises. I'm going to find, based on the uncontroverted testimony, that the defendant had no standing, looking at State's Exhibit B[19] and the addresses he has listed in the exhibit, to challenge the legality of the search at that apartment.

---

[18] State's Exhibit A is the consent to search form that Solis signed on February 21, 2005.

[19] State's Exhibit B is the "statement information supplement" form that the appellant completed.

However, I'm also going to find, in the event that there is some disagreement at the appellate court level on this matter, that even if they find the defendant had standing, clearly Maria Solis was the resident of that apartment. She provided lawful consent to search the apartment pursuant to State's Exhibit A, and all the testimony that this officer has offered. And she was the person on the lease. She had the keys. So she had the authority to allow law enforcement to enter that residence and search it. So any evidence that was seized as a result of that at this point is admissible.

The Fourth Amendment protects individuals "against unreasonable searches and seizures."[20] Any defendant seeking to suppress evidence obtained in violation of the Fourth Amendment must first show that he personally had a reasonable expectation of privacy that the government invaded.[21] Only after a defendant has established his standing to complain may a court consider whether he has suffered a substantive Fourth Amendment violation.[22]

An "overnight guest" has a legitimate expectation of privacy in his host's home.[23] The appellant claims that he has standing to raise a Fourth Amendment complaint because he was an "overnight guest" at Solis' apartment. The trial court ruled that the appellant lacked standing to challenge the legality of the search. But Titus testified that Solis said the appellant stayed at her apartment the night before she gave consent to search:

---

[20] *Johnson v. State,* 226 S.W.3d 439, 443 (Tex. Crim. App. 2007).

[21] *Kothe v. State,* 152 S.W.3d 54, 59 (Tex. Crim. App. 2004), *citing Rakas v. Illinois,* 439 U.S. 128, 139 (1978).

[22] *Id.*

[23] *See Minnesota v. Olson,* 495 U.S. 91, 98 (1990).

Q. And during the conversation did [Solis] tell you [the appellant] was there on that day that you were talking to her?

A. Yes.

Q. Did she tell you whether he had spent the night there or not?

A. Yes.

Q. And what -- what did she tell you, that he had?

A. Yes. And that when she woke up that morning he was still there.

Q. And she left him. I mean, he -- he remained in the apartment after she left?

A. Correct.

Q. Did she tell you -- did she tell you how long prior to your interview he had been at that apartment?

A. No. Not that I recall.

Q. What else did you ask her after that? What did -- did you ever -- how did you approach the subject of entering her apartment?

A. I had asked her for consent to go into her apartment and search for items that may have been taken from the complainant's home. And during that conversation she indicated to me that the defendant was still in her apartment.

Even if we assume that the appellant has standing as an "overnight guest," his Fourth Amendment claim fails on its merits. A warrantless search is presumptively unreasonable unless it falls within the scope of one of a few well-delineated exceptions.[24] For example,

_____

[24]
 *Johnson,* 226 S.W.3d at 443.

a third party may properly consent to a search when she has control over and authority to use the premises being searched.[25] The evidence in this case demonstrates that Solis had control over and authority to use the apartment. Her name was on the apartment lease and she possessed both sets of keys to the dwelling. She denied that the appellant lived with her and explained that he stayed with her only "on and off." Further, although the appellant himself stated that he lived at his sister's home, he listed a different home address on his "statement information supplement" form. The search of Solis' apartment was supported by her valid consent.[26] The trial court did not err in denying the appellant's motion to suppress the evidence obtained as a result of the warrantless search. Point of error eleven is overruled.

In point of error twelve, the appellant argues that the trial court erred in admitting the extraneous offense victim impact testimony of Phillip Settles and Michael McGloughlin. The State presented evidence that the appellant broke into Settles' apartment in the middle of the night in July 1998. The prosecutor asked Settles, "Did that scare you?" He replied, "Ma'am, I feel very lucky today. Very lucky indeed that none of my family got hurt." At

---

[25] *Balentine,* 71 S.W.3d 763, 772 (Tex. Crim. App. 2002), *citing United States v. Matlock,* 415 U.S. 164, 171 (1974).

[26] The appellant likens this case to *Georgia v. Randolph,* 547 U.S. 103, 120 (2006), in which the United States Supreme Court addressed the issue of consent for co-inhabitants of shared premises. The Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable to him on the basis of consent given to the police by another resident." However, there was no evidence at the suppression hearing that the appellant was anything more than an overnight guest as described in *Minnesota v. Olson.* 495 U.S. at 98. Nor was there any evidence that the appellant was both physically present *and* expressly refused consent. *Randolph,* 547 U.S. at 120.

that point, defense counsel objected that "those aren't charges we're being tried on," and the trial court overruled the objection. This was followed by a break in the proceedings with the jury not present. During the break, defense counsel clarified that he "was objecting to the victim impact statement part of that." The trial court responded that the clarification would be "noted for the record."

A timely and specific objection is required to preserve error for appeal.[27] If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and any claim of error is forfeited.[28] The appellant's objection to Settles' testimony was untimely because it was made after the question was asked and answered.

The State also presented evidence that the appellant and others broke into McLoughlin's home in the early morning hours in June 2004. The prosecutor asked McLoughlin to tell the jury what he felt like that night. Defense counsel made a timely objection to "extraneous victim impact evidence," which the trial court overruled. McLoughlin then testified that he was afraid that the assailants would kidnap his young daughter or would hurt or kill him or his family.

Victim-impact evidence in a homicide case is evidence of the effect of an offense on

---

[27] TEX R. APP. P. 33.1.

[28] *Lagrone v. State,* 942 S.W.2d 602, 618 (Tex. Crim. App. 1997).

people *other* than the victim.[29] The evidence at issue here is evidence of the fear experienced by the victim of the extraneous offense during the burglary. Thus, it is not victim-impact evidence in this case.[30] The trial court did not err in admitting the testimony of either McLoughlin or Settles. Point of error twelve is overruled.

In point of error thirteen, the appellant argues that the trial court should have suppressed the identification testimony of State's witness Candido Tovar. He contends that Tovar's in-court identification was tainted by an impermissibly suggestive pretrial photo array.

An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification.[31] The test is whether, considering the totality of the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."[32] Reliability is the linchpin in determining the admissibility of identification testimony.[33] The following five non-exclusive factors should be "weighed against the corrupting effect of any

---

[29]

   *Roberts v. State,* 220 S.W.3d 521, 531 (Tex. Crim. App.), *cert. denied,* 128 S. Ct. 282 (2007).

[30]

   *Id.*

[31]

   *Ibarra v. State,* 11 S.W.3d 189, 195 (Tex. Crim. App. 1999).

[32]

   *Id.*

[33]

   *Id.*

suggestive identification procedure in assessing reliability under the totality of the circumstances": (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.[34]

The trial court held a pretrial hearing on the appellant's motion to suppress the photographic identification. Tovar, the complainant in an extraneous aggravated robbery on March 23, 2004, testified at the hearing that he first attempted to make a possible suspect identification "the next day." Tovar testified that he "knew exactly" what his assailant looked like and that he had "described him completely." He testified that the "biggest thing" he remembered was the tattoo on the back of the assailant's head. He met with Detective Richard Leonard of the San Antonio Police Department, who told him to look through some pictures of people "that committed these kind of crimes before." Tovar viewed "quite a few" pictures on a computer. He testified that there were "multiple pictures" on each page, "but you could zoom in if you wanted to and go one by one." He was unable to identify anyone at that time.

Tovar testified that he returned to Leonard's office again about a week later and viewed multiple photographs on a computer screen and on paper. The first time Tovar met with him, Leonard mistakenly thought Tovar said he had seen a tattoo on the back of the

---

[34] *Id., citing Neil v. Biggers,* 409 U.S. 188, 199 (1972).

assailant's neck.  The second time they met, Tovar clarified that he had seen a tattoo on the back of the assailant's head.  Tovar denied that Leonard said anything suggestive before he viewed the photographs.  Leonard appeared to be "startled" when he showed Tovar the paper array that contained the appellant's photograph, because Tovar "pointed him out right away," "before he even put the paper down."  After Tovar identified the appellant in the paper array, Leonard showed him a photo of the tattoo on the back of the appellant's head, which Tovar also recognized.  Tovar further testified that Leonard called him the next day and said that he had identified the right guy.

Leonard's testimony at the pretrial hearing varied slightly from that of Tovar. Leonard testified at the pre-trial hearing that he showed Tovar "nearly 900 photographs" in the computerized "mug book" on two separate occasions at his office, and Tovar failed to identify anyone.  However, when he met with Tovar a third time and showed him a paper array of six photos, Tovar identified the appellant.  The prosecutor questioned Leonard as follows:

Q. And when you presented that photo lineup to Mr. Tovar, how did you present it to him?

A. I -- I sat it down in front of him and I told him, Okay, there's a suspect in this lineup.  I can't tell you who it is.  Let me know if there's anybody that looks familiar to you.

Q. You told him there was a suspect in the lineup?

A. We have -- we have a suspect and we've placed him in the lineup, and let me know if there's anybody that looks suspicious to you.  I'm sorry. Excuse me.  That looks familiar to you.

Q.      And did he recognize anyone?

A.      As I was laying it down, he pointed it to him and said, That's him.

*          *          *

Q.      I'm going to show you what's been admitted as State's Exhibit 162-A. Is that the copy of the photo lineup that he picked someone out of?

A.      Yes, it is.

Q.      Which photograph did he pick?

A.      Number 6.

Q.      And [who is] shown in that photograph?

A.      [The appellant].

Q.      And after he recognized [the appellant], did he -- did you have him sign and date that photograph?

A.      I did.

Q.      Okay.

Detective Leonard, I'm going to ask you to look at page four of your report, the entry that's dated August 11th of 04, 15:17 hours.

A.      Okay.

Q.      In there -- do you have in your report that you told him that there was a suspect in the lineup?

A.      No.

Q.      Okay. And so is that just something that you have remembered today?

A.      No. I don't specifically remember saying there was a suspect. I told him there was somebody, a suspect, I just used that word, an individual.

Q.    That's the issue we're here on right now.  So it's very important that you are very specific about what you told him.  Take a minute and remember exactly what instructions you gave Mr. Tovar when you handed him that lineup.

(Pause in Proceedings)

A.    Well I try to keep to the same script every time.  What I -- what I would tell them, and I'll say it is exactly as I always say to people: Okay. What we have are six individuals.  The suspect may or may not be in the lineup.  We can't tell you.  You just need to let us know if anybody looks familiar.

Q.    So is that what you remember telling Mr. Tovar, or what you said before?  Which --

A.    Well that's what I use every time.  When I -- I said, Well the suspect may be in here.  I'm just going through -- I was paraphrasing.

On cross-examination, Leonard acknowledged that he could not say whether Tovar had previously seen the other five photos in the array.  Any one of the other five photos could have been in the computerized "mug book."

The trial court denied the motion to suppress, and Tovar subsequently made an in-court identification of the appellant.  Tovar testified at trial that the appellant was the person who carjacked him on the night of March 23, 2004.  The appellant forced his way into Tovar's truck at gunpoint, then made Tovar drive to another location where he bound him with duct tape and left him before taking off in his truck.  Tovar was eventually able to free himself and went to a gas station where he called the police.  The prosecutor continued to question Tovar as follows:

Q.    Did the police then come and take a report from you?

A.     Yes.

Q.     And while you were -- how long do you think you were face-to-face with this defendant?

A.     Face-to-face?

Q.     Or how long -- how much time did you spend with him where you could look at his face?

A.     All the time that I was driving when we were driving.

Q.     And how long was that?

A.     I guess about at least 10 minutes to 20 minutes.

Q.     And he never had anything covering his face.  Right?

A.     No.  Well he had a moustache and goatee, and he was wearing [a] cap. You could tell he was trying to cover the tattoo on the back.

Q.     You saw a tattoo on the back of his head?

A.     Yes.

Q.     And can you describe that tattoo?

A.     It's [sic] covers the -- the whole back side of his head.  And like thorns, or fire, or flames, or something like that.

Q.     And did you describe that tattoo to the police officer that arrived that night?

A.     Yes.

Tovar further testified that he later met with Detective Leonard twice and looked at numerous photos.  He recognized the appellant in the last photo lineup "before [Leonard]  even put it on the table."  The prosecutor asked, "And how did you recognize that person, or where did

you recognize that person from?" Tovar responded, "From the time that I was carjacked."

He testified that, after he identified the appellant in the photo array, Leonard showed him a

photo of the appellant's tattoo. He said he recognized the tattoo "[f]rom the time that I got

carjacked that night."

The photo array, labeled State's Exhibit 162, contains headshots of the appellant and

five other males. All of them are wearing glasses and have moustaches and/or goatees. The

aAppellant complains that the other men shown have "notably fuller faces" and that "[t]he

one glaring difference is that [the appellant] appears to be either totally bald, or to have had

his head clean shaven." However, lineup participants need not be identical to satisfy due

process requirements.[35] Further, given that Tovar testified that the appellant was wearing a

cap at the time of the crime, his hair length was not necessarily a determinative factor.

The appellant points out that Tovar *might* have already seen the five other photos in

the array. This is speculative. Leonard could not say for sure whether any of the other five

photos in State's Exhibit 162 came from the 900 photos previously viewed by Tovar. The

appellant complains that Leonard increased the likelihood of identification by telling Tovar

to look through pictures of people "that committed these kind of crimes before," but it

appears that Leonard made this statement in reference to the computerized "mug book," not

State's Exhibit 162.

The appellant also argues that Leonard "bolstered in Mr. Tovar's mind the accuracy

---

[35] *See Buxton v. State,* 699 S.W.2d 212, 216 (Tex. Crim. App. 1985).

of the identification he had made, by telling him that he had got 'the right guy.'" Although this may have been suggestive, it was not so suggestive as to present a very substantial likelihood for irreparable misidentification. Tovar had a good opportunity to view the appellant and his tattoo during the crime. He testified that he "knew exactly" what the appellant looked like and that he "described him completely" to police. Leonard testified that "the art work on the tattoo was real distinctive the way it was described" by Tovar. When Tovar identified the appellant in the photo array about a week after the crime, he "startled" Leonard by pointing the appellant out so quickly. Leonard described Tovar as "positive" in his identification of the appellant. Weighing this evidence of reliability against the suggestiveness of Leonard's statement, we conclude that no substantial risk of irreparable misidentification was created so as to deny the appellant due process.[36] Point of error thirteen is overruled.

In point of error fourteen, the appellant argues that the trial court erred in refusing to allow defense counsel to "close the arguments on mitigation." The appellant acknowledges that we have previously rejected this type of claim.[37] We decline to revisit the issue here. Point of error fourteen is overruled.

In points of error fifteen and sixteen, the appellant asserts that the trial court erroneously denied his motion to preclude the death penalty as a sentencing option. The

---

[36] *See Ibarra,* 11 S.W.3d at 196.

[37] *Masterson v. State,* 155 S.W.3d 167, 174 (Tex. Crim. App. 2005).

appellant argued in the motion that Article 37.071 violates the Fourteenth Amendment right to equal protection because "there are no uniform, statewide standards to guide Texas prosecutors in deciding when they should seek the death penalty." He also complained in the motion that the grand jury did not consider the punishment special issues when deciding whether to indict him, citing *Blakely, Ring,* and *Apprendi.*[38] He asserts on appeal that the trial court should have granted his motion on these bases. We have previously rejected such claims.[39] We decline to reconsider our holdings in these cases. Points of error fifteen and sixteen are overruled.

In point of error seventeen, the appellant asserts that Article 37.071 is unconstitutional because it impermissibly shifts the burden of proof to the defendant. In point of error eighteen, he argues that the "10-12 Rule" is unconstitutional. In point of error nineteen, he argues that Article 37.071 violates the Eighth and Fourteenth Amendments because it fails to define the terms "probability," "criminal acts of violence," "continuing threat to society," "personal moral culpability," and "moral blameworthiness." In point of error twenty, he complains that the use of the indefinite term "probability" in Article 37.071 is unconstitutional because the jury "could have applied any definition to the term . . . even interpreting it as requiring far less than a 50% chance of recurring violence." In point of

---

[38]

*Blakely v. Washington,* 542 U.S. 296 (2004); *Ring v. Arizona,* 536 U.S. 584 (2002); *Apprendi v. New Jersey,* 530 U.S. 466 (2000).

[39]

*Roberts,* 220 S.W.3d at 535; *Threadgill v. State,* 146 S.W.3d 654, 671-72 (Tex. Crim. App. 2004), *citing Rayford v. State,* 125 S.W.3d 521, 534 (Tex. Crim. App. 2003).

error twenty-one, he asserts that this Court is constitutionally required to conduct a "comparative proportionality review" on appeal. In points of error twenty-two and twenty-three, the appellant complains that the Texas death-penalty scheme fails "to require meaningful appellate review of the jury's response to the mitigation special issue," in violation of the Eighth and Fourteenth Amendments and Article 44.251. In point of error twenty-four, the appellant challenges the version of Article 37.071 under which he was sentenced because it failed to provide the jury with the option to sentence him to life without parole. We have rejected all of these claims in previous cases.[40] Again, we decline to revisit these issues in this case. Points of error seventeen through twenty-four are overruled.

In point of error twenty-five, the appellant contends that the court's charge to the jury on punishment violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution. He argues that the trial court "strayed from the statutory instructions" in Article 37.071, § 2(d)(1), which requires the trial court to charge the jury that

> in deliberating on the [future dangerousness and anti-parties] issues . . . it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

---

[40] *Threadgill,* 146 S.W.3d at 671; *Russeau v. State,* 171 S.W.3d 871, 886 (Tex. Crim. App. 2005), *cert. denied,* 126 S. Ct. 2982 (2006); *Conner v. State,* 67 S.W.3d 192, 203 (Tex. Crim. App. 2001); *Murphy v. State,* 112 S.W.3d 592, 606 (Tex. Crim. App. 2003); *Druery v. State,* 225 S.W.3d 491, 509 (Tex. Crim. App.), *cert. denied,* 128 S. Ct. 627 (2007); *Robison v. State,* 888 S.W.2d 473, 481-82 (Tex. Crim. App. 1994); *Renteria v. State,* 206 S.W.3d 689, 707 (Tex. Crim. App. 2006); *Prystash v. State,* 3 S.W.3d 522, 536 (Tex. Crim. App. 1999); *Arnold v. State,* 873 S.W.2d 27, 39-40 (Tex. Crim. App. 1993).

Instead, the trial court charged the jury as follows:

> In deliberating upon the special issues, you shall consider all evidence admitted in this case, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

The appellant asserts that the trial court erred "by applying to the mitigation special issue a version of the instruction given at art. 37.071 § 2(d)(1), which should have applied to the future dangerousness issue alone." Thus, he argues that the trial court's instruction "conflated" the future dangerousness and mitigation special issues and made the imposition of a death sentence more likely.

We previously rejected this type of claim in *Scheanette v. State.*[41] The appellant, like Scheanette, has failed to demonstrate "egregious harm."[42] The trial court here instructed the jury on mitigation in accordance with Article 37.071, § 2(e)(1), which directs the court to instruct the jury to take into consideration "all of the evidence" when determining whether there are sufficient mitigating circumstances to warrant the imposition of a sentence of life imprisonment.[43] This statute requires the jury to look at all of the evidence and not just evidence a juror might consider to be mitigating.[44] Because the appellant's jury was entitled

---

[41] 144 S.W.3d 503, 507-08 (Tex. Crim. App. 2004).

[42] *Id.; Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)(op. on reh'g).

[43] *See Scheanette,* 144 S.W.3d at 507-08.

[44]

(continued...)

to consider all of the evidence, any variations in the language of the instruction did not harm

him.[45]  Point of error twenty-five is overruled.  We affirm the judgment of the trial court.


Delivered:     October 29, 2008
Publish

---

[44](...continued)
*Id.* at 508.

[45]

*See id.*