**Opinion filed June 11, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-07-00291-CR

_____

## KELVIN MILLER, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 2**

**Tarrant County, Texas**

**Trial Court Cause No. 1047027D**

## M E M O R A N D U M   O P I N I O N

The jury convicted Kelvin Miller of two offenses of aggravated robbery, found that a deadly weapon was used or exhibited in each offense, and assessed his punishment at confinement for forty-seven years for each offense. The jury also assessed a $2,812 fine for the second offense. We affirm.

There is no challenge to the sufficiency of the evidence. The record reflects that appellant and another man approached Stephen "Steve" Krieger while he was welding on a barbecue grill in his garage. Appellant began talking to Steve. Kimberly "Kim" Krieger had just put the couple's

one-year-old son to sleep when she saw appellant and the other man walking up to Steve in the garage. Kim was concerned because the two men approached Steve from either side so that Steve was in the middle and because their conversation was "very odd."

When Kim walked into the garage, appellant stepped in front of her physically blocking her in the garage. Appellant then pulled a gun, pointed it at Kim's head, and asked if anyone else was in the house. Kim told appellant that their son was the only other person in the house. Appellant then told Kim and Steve that he would shoot them unless they gave him money.

When Steve told appellant that he did not have any money, appellant cocked the gun and put it to Kim's head. Kim testified that she thought she was going to die. Steve reached inside the door to the house and pulled out his wallet. He opened his wallet, handed $12 to appellant, and showed appellant that he had no other money. Steve testified that, out of concern for his family's safety, he decided that he was not going to allow either appellant or the other man into his house. Steve believed that appellant would shoot them and was concerned that, if he was complacent, he would have no control over the situation.

Steve told Kim to look down at the pavement, and together they walked slowly out of the garage. Appellant threatened them, but Steve and Kim kept walking while Steve explained that they were leaving and that they just wanted appellant and his friend to "just go."

Kim and Steve identified appellant both in open court and in a photo lineup. They each testified that they were shown seven photo lineups on two different days. They each picked out appellant's picture and marked the photo lineup accordingly. The marked lineups were introduced into evidence as State's Exhibit Nos. 2 and 3. Steve testified that, when he saw appellant's photo in the layout, that was the first time he had seen appellant's face since the robbery. Steve recognized appellant right away. Kim testified that she recognized appellant "instantly" and that there was no doubt in her mind.

In his first issue, appellant contends that the photo lineup was improper and argues that the trial court erred when it denied his oral motion to suppress Kim's and Steve's in-court identification of him. The record before this court does not support appellant's claims.

Police Detective David Friaz testified that he compiled a total of seven photo layouts for the victims to view. The robbery occurred on October 15, 2006. On October 17, Detective Friaz

showed four of the layouts to the victims. On October 19, he showed them the other three. Only one photo layout contained appellant's picture, and it was one of the three Detective Friaz displayed on October 19. The only person Kim or Steve identified was appellant.

Detective Friaz provided the district attorney's office with a copy of the layout containing appellant's picture where both Kim and Steve identified appellant as the person who robbed them. Detective Friaz testified that he placed copies of all of the photo layouts in his file. He eventually cleaned out the file and placed the copies of the other six layouts in his personal box of items to be shredded. The box was located in his office and, to his knowledge, not used by anyone else. Detective Friaz retrieved copies of the six layouts that did not include appellant's photo, and the layouts were introduced into evidence. Detective Friaz identified each layout as being a copy of what he had originally shown Kim and Steve.

Detective Friaz also testified as to how he compiled the layouts for photo lineups. First he would choose a mug shot that fit the general description of the suspect. Then, he would run a computer program that selected mug shots of other people with similar characteristics.

An impermissibly suggestive pretrial photo lineup will taint a subsequent in-court identification. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008); *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999). The totality of the circumstances must be considered to determine whether "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Luna*, 268 S.W.3d at 605; *Ibarra*, 11 S.W.3d at 195. Factors to be considered in determining the admissibility of the identification include the opportunity of the witness to view the perpetrator during the crime, the degree of attention the witness gave the perpetrator, the level of certainty the witness demonstrated when identifying the perpetrator, and the length of time between the crime and the photographic lineup. *Luna*, 268 S.W.3d at 605; *Ibarra*, 11 S.W.3d at 195.

In reviewing a trial court's ruling on a motion to suppress, appellate courts must give great deference to the trial court's findings of historical facts as long as the record supports the findings. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Because the trial court is the exclusive factfinder, the appellate court reviews evidence adduced at the suppression hearing in the light most favorable to the trial court's ruling. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App.

3

2000). We also give deference to the trial court's rulings on mixed questions of law and of fact when those rulings turn on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. Where such rulings do not turn on an evaluation of credibility and demeanor, we review the trial court's actions de novo. *Guzman*, 955 S.W.2d at 89; *Davila v. State*, 4 S.W.3d 844, 847-48 (Tex. App.—Eastland 1999, no pet.).

The trial court did not err by denying appellant's motion to suppress. The robbery occurred in the daytime, and both Kim and Steve had ample opportunity to view appellant during the commission of the offense. Both Kim and Steve unequivocally identified appellant as the man who robbed them four days earlier. Nothing in Detective Friaz's testimony or in the testimony of Kim and Steve supports appellant's conclusion that the pretrial photographic lineup procedure was impermissibly suggestive. The first issue is overruled.

Next, appellant argues that the trial court erred when it denied his motion for mistrial. After the State had rested, Juror Al Starks passed the bailiff a note in which he said that he thought he might know Steve from the Navy. The issue was brought to the trial court's attention, and the trial court conducted a hearing outside the presence of the rest of the jury panel. At the conclusion of the hearing, the trial court denied appellant's motion to excuse Juror Starks and for a mistrial. Appellant argues that he was denied a fair and impartial trial because of Juror Starks's bias. We disagree.

Juror Starks testified that he was an employment counselor for the military. He helped people who were leaving the military find employment. Juror Starks thought that he might have spoken to Steve in the course of his employment. Juror Starks stated that their meeting would have been two years prior to the trial and for about twenty minutes. He further testified, "I don't -- I don't think he would recall me at all, but I just know that I did see -- I think I have seen him before and I thought I should tell you." Juror Starks went on to state that he and Steve never sat down to talk and that he did not think that their possible prior contact would affect his verdict in any way.

Appellant points out in his brief that it was never established if Juror Starks did in fact counsel Steve two years prior to trial for twenty minutes and that all that was established was Juror Starks's impression that he might have had brief contact with Steve on a professional basis two years prior to trial. Nothing in the record supports the claims that the trial court failed to take appropriate action when Juror Starks expressed his concerns. The facts of this case are quite

4

distinguishable from those in *Franklin v. State*, 138 S.W.3d 351 (Tex. Crim. App. 2004), where it was conclusively established that a juror withheld information on voir dire. The second issue is overruled.

On direct, as Steve described the robbery, the following occurred:

Q: What did he tell you to do?

A: He said let's go in the house.

Q: What did you think when he said let's go in the house?

A: I thought there's no way I can let someone in my house.

Q: Why did you think that?

A: Because I have a two year old.

Q: So what did you do?

A: We talked -- it was the same kind of exchange back and forth a couple of times. And then I said, Well, I have a wallet inside, right inside the door. I can give you whatever's in it. And so I opened the door and leaned way inside to get this wallet so no one would follow me inside. And pulled out my wallet and opened it up and I had -- I had described that I had just taken my parents out to a lunch so I didn't have any money. I didn't have any cash. I even showed him the receipt of the place we had gone to eat. And I said here's -- you can have everything that's in here and I -- I handed it to him.

Q: Why did you lean into the house as opposed to walking into the house?

A: Because I -- at -- at no point could I allow anybody to come into my house.

Q: Why is that?

A: Because --

[DEFENSE COUNSEL]: Asked and answered, Your Honor.

THE COURT: Overruled.

5

A: Because I have -- I have a child in there. And once someone were to come into the house -- if someone were robbing me and they wanted me to get into the house, they could then say put the garage door down and then you -- then they could take for whatever to do whatever they wanted. Whereas, at least if we were in the garage, we were relatively public.

Q: Had you read books on what to do in crisis situations?

A: Yes.

[DEFENSE COUNSEL]: Object, Your Honor. Leading the witness again.

THE COURT: Overruled.

A: Yes.

Q: What kind of books had you read?

A: Well, there's one called The Gift of Fear, which is all about self-preservation in crisis situations, like a robbery, like a -- you know, when -- when -- when you're at -- you're liberty -- your -- forgive me. I'm a little nervous. When your safety is at risk, how to minimize the situation, minimize damage and minimize risk to yourself. And how to listen [to] your instincts about people and how they act, about body language, things they say. That -- that sort of stuff.

Q: You'd also seen a video?

A: Yes.

Q: What was the video?

A: The video is called Strong Against Crime and it's from -- by a man named Sanford Strong. And --

Q: What -- what does it tell you?

A: His -- his deal is that a lot of -- a lot of training and preparedness will --

[DEFENSE COUNSEL]: Objection, Your Honor. It's hearsay. He's talking about what's in a book. He's repeating what's in the book.

THE COURT: Any exception?

6

[PROSECUTOR]: Let me rephrase, Your Honor.

THE COURT: All right.

Q: What did you learn from the book.

A: That going to -- what -- what is called crime scene number two must be avoided at all costs. And that means going in a house, getting in the car, going with someone who is assaulting you or robbing you because you are at -- at a far more at risk to go to crime scene number two. Because if someone's willing to hurt you where you are, they're certainly willing to hurt you where they're going to take you.

[PROSECUTOR]: Permission to approach, Your Honor.

THE COURT: Yes.

Q: I'm showing you what's been marked as State's Exhibit 40. Do you recognize this?

A: Yes.

Q: What is it?

A: It's the book The Gift of Fear and the video "Strong Against Crime."

Q: All right. And those are the same condition -- this picture is in the same condition as when we took the picture, correct?

A: Absolutely.

[PROSECUTOR]: All right. Your Honor, at this time I offer State's Exhibit 40 into evidence for all purposes.

[DEFENSE COUNSEL]: Your Honor, we object to relevancy. He's already testified about the title and the con -- the basic nature of the book and the video. It's -- it's duplicitous to -- it's just acts, you know, it's -- it's excessive. It's absolutely not necessary for anything. It doesn't aid the jury in understanding what the witness has described. It doesn't aid the jury in anything, other than they get to see the cover of the book. It's just not relevant.

THE COURT: Overruled.

7

In his last two issues, appellant contends that the trial court erred when it allowed Steve to testify concerning how victims of a crime should behave and when it admitted State's Exhibit No. 40. Appellant argues that Steve's testimony was hearsay and blatantly irrelevant and that Exhibit No. 40 had no probative value at all. The State replies that appellant has not preserved his complaints for appellate review. We agree.

Appellant objected to Steve's testimony concerning the book on the grounds of leading. After appellant made his hearsay objection to Steve's testimony concerning the video, the State rephrased its questions, and no objections were raised. When State's Exhibit No. 40 was offered into evidence, appellant objected on the grounds of duplicity and relevancy. Appellant failed to preserve error for appellate review. TEX. R. APP. P. 33.1. Moreover, Steve's statements were not offered to prove the truth of the matter asserted but were offered to show his state of mind and basis for his actions and, therefore, were not hearsay and were relevant. *See* TEX. R. EVID. 401, 801. The third and fourth issues are overruled.

The judgment of the trial court is affirmed.

JIM R. WRIGHT

CHIEF JUSTICE

June 11, 2009

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.

8