Opinion filed June 11, 2009 











 
 
  
 
 







 
 
  
 
 




Opinion filed June 11,
2009 

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-07-00291-CR

                                                    __________

 

                                        KELVIN MILLER, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                 On
Appeal from the Criminal District Court No. 2

 

                                                         Tarrant
County, Texas

 

                                                Trial
Court Cause No. 1047027D

 



 

                                            M
E M O R A N D U M    O P I N I O N

The
jury convicted Kelvin Miller of two offenses of  aggravated robbery, found that
a deadly weapon was used or exhibited in each offense, and assessed his punishment
at confinement for forty-seven years for each offense.  The jury also assessed
a $2,812 fine for the second offense.  We affirm.








There
is no challenge to the sufficiency of the evidence.  The record reflects that
appellant  and another man approached Stephen ASteve@ Krieger while he was
welding on a barbecue grill in his garage.  Appellant began talking to Steve. 
Kimberly AKim@ Krieger had just put the
couple=s one-year-old
son to sleep when she saw appellant and the other man walking up to Steve in
the garage.  Kim was concerned because  the two men approached Steve from
either side so that Steve was in the middle and because their conversation was Avery odd.@

When
Kim walked into the garage, appellant stepped in front of her physically
blocking her in the garage.  Appellant then pulled a gun, pointed it at Kim=s head, and asked if anyone
else was in the house.  Kim told appellant that their son was the only other
person in the house.  Appellant then told Kim and Steve that he would shoot
them unless they gave him money.

When
Steve told appellant that he did not have any money, appellant cocked the gun
and put it to Kim=s
head.  Kim testified that she thought she was going to die.  Steve reached
inside the door to the house and pulled out his wallet.  He opened his wallet,
handed $12 to appellant, and showed appellant that he had no other money. 
Steve testified that, out of concern for his family=s safety, he decided that he was not going to
allow either appellant or the other man into his house.  Steve believed that
appellant would shoot them and was concerned that, if he was complacent, he
would have no control over the situation.

Steve
told Kim to look down at the pavement, and together they walked slowly out of
the garage.  Appellant threatened them, but Steve and Kim kept walking while
Steve explained that they were leaving and that they just wanted appellant and
his friend to Ajust
go.@

 Kim
and Steve identified appellant both in open court and in a photo lineup.  They
each testified that they were shown seven photo lineups on two different days. 
They each picked out appellant=s
picture and marked the photo lineup accordingly.  The marked lineups were
introduced into evidence as State=s
Exhibit Nos. 2 and 3.  Steve testified that, when he saw appellant=s photo in the layout, that
was the first time he had seen appellant=s
face since the robbery.  Steve recognized appellant right away.  Kim testified
that she recognized appellant Ainstantly@ and that there was no
doubt in her mind.

In
his first issue, appellant contends that the photo lineup was improper and
argues that the trial court erred when it denied his oral motion to suppress
Kim=s and Steve=s in-court identification
of him.  The record before this court does not support appellant=s claims.








Police
Detective David Friaz testified that he compiled a total of seven photo layouts
for the victims to view.  The robbery occurred on October 15, 2006.  On October
17, Detective Friaz showed four of the layouts to the victims.  On October 19,
he showed them the other three.  Only one photo layout contained appellant=s picture, and it was one
of the three Detective Friaz displayed on October 19.  The only person Kim or
Steve identified was appellant.

Detective
Friaz provided the district attorney=s
office with a copy of the layout containing appellant=s picture where both Kim and Steve identified
appellant as the person who robbed them.  Detective Friaz testified that he
placed copies of all of the photo layouts in his file.  He eventually cleaned
out the file and placed the copies of the other six layouts in his personal box
of items to be shredded.  The box was located in his office and, to his
knowledge, not used by anyone else. Detective Friaz retrieved copies of the six
layouts that did not include appellant=s
photo, and the layouts were introduced into evidence.  Detective Friaz
identified each layout as being a copy of what he had originally shown Kim and
Steve.

Detective
Friaz also testified as to how he compiled the layouts for photo lineups. 
First he would choose a mug shot that fit the general description of the
suspect.  Then, he would run a computer program that selected mug shots of
other people with similar characteristics.

An
impermissibly suggestive pretrial photo lineup will taint a subsequent in-court
identification.  Luna v. State, 268 S.W.3d 594, 605 (Tex. Crim. App.
2008); Ibarra v. State, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999).  The
totality of the circumstances must be considered to determine whether Athe photographic
identification procedure was so impermissibly suggestive as to give rise to a
very substantial likelihood of irreparable misidentification.@  Luna, 268 S.W.3d
at 605; Ibarra, 11 S.W.3d at 195.  Factors to be considered in
determining the admissibility of the identification include the opportunity of
the witness to view the perpetrator during the crime, the degree of attention
the witness gave the perpetrator, the level of certainty the witness
demonstrated when identifying the perpetrator, and the length of time between
the crime and the photographic lineup.  Luna, 268 S.W.3d at 605; Ibarra,
11 S.W.3d at 195.








In
reviewing a trial court=s
ruling on a motion to suppress, appellate courts must give great deference to
the trial court=s
findings of historical facts as long as the record supports the findings.  Guzman
v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  Because the trial
court is the exclusive factfinder, the appellate court reviews evidence adduced
at the suppression hearing in the light most favorable to the trial court=s ruling.  Carmouche v.
State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).  We also give deference
to the trial court=s
rulings on mixed questions of law and of fact when those rulings turn on an
evaluation of credibility and demeanor.  Guzman, 955 S.W.2d at 89.  Where
such rulings do not turn on an evaluation of credibility and demeanor, we
review the trial court=s
actions de novo.  Guzman, 955 S.W.2d at 89; Davila v. State, 4
S.W.3d 844, 847-48 (Tex. App.CEastland
1999, no pet.).

The
trial court did not err by denying appellant=s
motion to suppress.  The robbery occurred in the daytime, and both Kim and
Steve had ample opportunity to view appellant during the commission of the
offense.  Both Kim and Steve unequivocally identified appellant as the man who
robbed them four days earlier.  Nothing in Detective Friaz=s testimony or in the
testimony of Kim and Steve supports appellant=s
conclusion that the pretrial photographic lineup procedure was impermissibly
suggestive.  The first issue is overruled. 

Next,
appellant argues that the trial court erred when it denied his motion for
mistrial.  After the State had rested, Juror Al Starks passed the bailiff a
note in which he said that he thought he might know Steve from the Navy.  The
issue was brought to the trial court=s
attention, and the trial court conducted a hearing outside the presence of the
rest of the jury panel.  At the conclusion of the hearing, the trial court
denied appellant=s
motion to excuse Juror Starks and for a mistrial.  Appellant argues that he was
denied a fair and impartial trial because of Juror Starks=s bias.  We disagree.

Juror
Starks testified that he was an employment counselor for the military.  He
helped people who were leaving the military find employment.  Juror Starks
thought that he might have spoken to Steve in the course of his employment. 
Juror Starks stated that their meeting would have been two years prior to the
trial and for about twenty minutes.  He further testified, AI don=t -- I don=t think he would recall me
at all, but I just know that I did see -- I think I have seen him before and I
thought I should tell you.@ 
Juror Starks went on to state that he and Steve never sat down to talk and that
he did not think that their possible prior contact would affect his verdict in
any way.








Appellant
points out in his brief that it was never established if Juror Starks did in
fact counsel Steve two years prior to trial for twenty minutes and that all
that was established was Juror Starks=s
impression that he might have had brief contact with Steve on a professional
basis two years prior to trial.  Nothing in the record supports the claims that
the trial court failed to take appropriate action when Juror Starks expressed
his concerns.  The facts of this case are quite distinguishable from those in Franklin
v. State, 138 S.W.3d 351 (Tex. Crim. App. 2004), where it was conclusively
established that a juror withheld information on voir dire.  The second issue
is overruled.

On
direct, as Steve described the robbery, the following occurred:

Q: 
What did he tell you to do?

 

A: 
He said let=s go in
the house.

 

Q: 
What did you think when he said let=s
go in the house?

 

A: 
I thought there=s no
way I can let someone in my house.

 

Q: 
Why did you think that?      

 

A: 
Because I have a two year old.

 

Q: 
So what did you do?

 

A: 
We talked -- it was the same kind of exchange back and forth a couple of
times.  And then I said, Well, I have a wallet inside, right inside the door. 
I can give you whatever=s
in it.  And so I opened the door and leaned way inside to get this wallet so no
one would follow me inside.  And pulled out my wallet and opened it up and I
had -- I had described that I had just taken my parents out to a lunch so I
didn=t have any
money.  I didn=t have
any cash.  I even showed him the receipt of the place we had gone to eat.  And
I said here=s -- you
can have everything that=s
in here and I -- I handed it to him.

 

Q: 
Why did you lean into the house as opposed to walking into the house?

 

A: 
Because I -- at -- at no point could I allow anybody to come into my house.

 

Q: 
Why is that?

 

A: 
Because --

 

[DEFENSE
COUNSEL]:  Asked and answered, Your Honor.

 

THE
COURT:  Overruled.

 








A: 
Because I have -- I have a child in there.  And once someone were to come into
the house -- if someone were robbing me and they wanted me to get into the
house, they could then say put the garage door down and then you -- then they
could take for whatever to do whatever they wanted.  Whereas, at least if we
were in the garage, we were relatively public.

 

Q: 
Had you read books on what to do in crisis situations?

 

A: 
Yes.

 

[DEFENSE
COUNSEL]:  Object, Your Honor.  Leading the witness again.

 

THE
COURT:  Overruled.

 

A: 
Yes.

 

Q:
What kind of books had you read?

 

A:
Well, there=s one
called The Gift of Fear, which is all about self-preservation in crisis
situations, like a robbery, like a -- you know, when -- when -- when you=re at -- you=re liberty -- your --
forgive me.  I=m a
little nervous.  When your safety is at risk, how to minimize the situation,
minimize damage and minimize risk to yourself.  And how to listen [to] your
instincts about people and how they act, about body language, things they say. 
That -- that sort of stuff.

 

Q: 
You=d also seen a
video?

 

A: 
Yes.

 

Q: 
What was the video?

 

A: 
The video is called Strong Against Crime and it=s
from -- by a man named Sanford Strong.  And --

 

Q: 
What -- what does it tell you?

 

A: 
His -- his deal is that a lot of -- a lot of training and preparedness will --

 

[DEFENSE
COUNSEL]:  Objection, Your Honor.  It=s
hearsay.  He=s talking
about what=s in a
book.  He=s repeating
what=s in the book.

 

THE
COURT:  Any exception?

 








[PROSECUTOR]: 
Let me rephrase, Your Honor.

 

THE
COURT: All right.

 

Q: 
What did you learn from the book.

 

A: 
That going to -- what -- what is called crime scene number two must be avoided
at all costs.  And that means going in a house, getting in the car, going with
someone who is assaulting you or robbing you because you are at -- at a far
more at risk to go to crime scene number two.  Because if someone=s willing to hurt you where
you are, they=re
certainly willing to hurt you where they=re
going to take you.

 

[PROSECUTOR]: 
Permission to approach, Your Honor.

 

THE
COURT:  Yes.

 

Q: 
I=m showing you what=s been marked as State=s Exhibit 40.  Do you
recognize this?

 

A: 
Yes.

 

Q: 
What is it?

 

A: 
It=s the book The Gift
of Fear and the video AStrong
Against Crime.@

 

Q: 
All right.  And those are the same condition -- this picture is in the same
condition as when we took the picture, correct?

 

A: 
Absolutely.

 

[PROSECUTOR]: 
All right.  Your Honor, at this time I offer State=s Exhibit 40 into evidence for all
purposes.

 

[DEFENSE
COUNSEL]:  Your Honor, we object to relevancy.  He=s already testified about the title and the
con -- the basic nature of the book and the video.  It=s -- it=s
duplicitous to -- it=s
just acts, you know, it=s
-- it=s excessive.  It=s absolutely not necessary
for anything.  It doesn=t
aid the jury in understanding what the witness has described.  It doesn=t aid the jury in anything,
other than they get to see the cover of the book.  It=s just not relevant.

 

THE
COURT:  Overruled.

 








In
his last two issues, appellant contends that the trial court erred when it
allowed Steve to testify concerning how victims of a crime should behave and
when it admitted State=s
Exhibit No. 40.  Appellant argues that Steve=s
testimony was hearsay and blatantly irrelevant and that Exhibit No. 40 had no
probative value at all.  The State replies that appellant has not preserved his
complaints for appellate review.  We agree.  

Appellant
objected to Steve=s
testimony concerning the book on the grounds of leading.  After appellant made
his hearsay objection to Steve=s
testimony concerning the video, the State rephrased its questions, and no
objections were raised.  When State=s
Exhibit No. 40 was offered into evidence, appellant objected on the grounds of
duplicity and relevancy.  Appellant failed to preserve error for appellate
review.  Tex. R. App. P. 33.1. 
Moreover, Steve=s
statements were not offered to prove the truth of the matter asserted but were
offered to show his state of mind and basis for his actions and, therefore,
were not hearsay and were relevant.  See Tex. R. Evid. 401, 801.  The third and fourth issues are
overruled.

The
judgment of the trial court is affirmed.

 

 

JIM R. WRIGHT

CHIEF JUSTICE

 

June 11, 2009

Do not publish. 
See Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.