# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-11-00213-CR
NO. 03-11-00214-CR
NO. 03-11-00215-CR
NO. 03-11-00216-CR
NO. 03-11-00217-CR

**John Niess, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
NOS. D-1-DC-10-202183, D-1-DC-10-202185, D-1-DC-10-202186, D-1-DC-10-500216,
D-1-DC-10-900336, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellant John Niess was indicted in five causes for thirteen counts of aggravated robbery with a deadly weapon. *See* Tex. Penal Code Ann. § 29.03 (West 2011). The five causes were consolidated for a single jury trial. At trial, the trial court granted defendant's motion for instructed verdict as to one of the counts, and the jury found Niess guilty of the remaining twelve counts. After Niess pleaded true to enhancement allegations, the jury assessed punishment at thirty years' imprisonment for each count, with the sentences to be served concurrently. On appeal, Niess argues that the trial court (1) erred in admitting evidence of an impermissibly suggestive pretrial photo identification procedure, (2) erred in admitting in-court identification testimony, tainted by the impermissibly suggestive pretrial photo identification procedure, and (3) abused its discretion

in refusing to grant a mistrial due to the introduction of highly prejudicial testimony concerning Niess's criminal history. Further, Niess argues one of the judgments of conviction fails to reflect that he was acquitted of one of the counts for which he was charged, and he requests that we modify this judgment to correct the error.[1] We modify the trial court's judgment of conviction as requested, and affirm that judgment as modified; we also affirm the remaining judgments of conviction.

**BACKGROUND**

Early on the morning of April 17, 2010, Niess, his brother Frank Niess, and Frank's then girlfriend, Erin Moody, went to the home of Steve Rodriguez and Servando Rodriguez.[2] While there, Frank informed Erin that the four men were leaving in her pickup truck to "hit some licks."[3] Sometime between 2:30 and 3:00 a.m., the four men left in Erin's truck, a red Ford F-150 with tinted windows and a black bar across the back window. Erin, along with Steve's girlfriend, stayed at the house.

Between 4:00 and 6:00 a.m. that same morning, law enforcement authorities began receiving numerous reports of robberies involving a red pickup truck in the Austin area. First, at 4:12 a.m., the Austin Police Department (APD) responded to a call from Naomi Garcia and her cousin, Leigh Carillo. Naomi and Leigh had left a local nightclub around 3:00 a.m. and driven to

---

[1] Though Niess raises these arguments in thirteen separate points of error, for convenience we have grouped the points of error into four legal issues on appeal.

[2] Unless otherwise noted, the facts recited herein are taken from the testimony and exhibits admitted at trial.

[3] Because many of the people involved in the events leading to Niess's arrest have the same last name, to avoid confusion we will refer to everyone involved by their first name, with the exception of appellant, whom we will refer to as "Niess."

the apartment complex of Naomi's friend, Ramiro Garcia.  For about an hour, Naomi and Leigh, along with Ramiro, remained in the parking lot of the apartment complex.  Leigh was inside the car listening to music and Naomi and Ramiro were outside the car socializing when, according to Naomi, a man wielding a shotgun approached her and Ramiro.  The man then put the gun to Naomi's rib, hit her twice, and ordered her and Ramiro to the ground.  Once Ramiro and Naomi were on the ground, a second man opened the car door with Leigh still inside.  At knife point, he took Leigh's purse and necklace before pulling her out of the car and dragging her to Naomi and Ramiro.  The assailants proceeded to tear Naomi's stereo from the car before leaving in a vehicle that Leigh later described at trial as a red SUV with tinted windows.  Leigh also testified that there were four assailants in total, and she described the man with the shotgun as heavyset and tall, wearing a red shirt, black shorts, and a red bandana on his face.  Once Naomi and Leigh were certain that the men were gone, Naomi and Leigh left the complex and called 9-1-1.

That same early morning, three teenage boys, Enemencio Alaniz, Tyshun Guzman, and Nick Barrientez, were walking home from a fast food restaurant when a truck pulled up beside them.  At trial, the boys described the truck as a red, four-door Ford with tinted windows and a bar on the back.  According to the boys, a heavyset man with short-cropped hair and a red shirt was sitting in the passenger seat.  The man asked the boys if they had any "good," which the boys understood to mean marijuana.  When the boys answered that they did not, the same man told one of the teenagers, Enemencio, to "come here."  When Enemencio refused, the man pointed a shotgun at him through the window, cocked it, and threatened to kill him if he did not comply.  The man then ordered two men in the back seat to get out of the truck.  The two men complied and, as they exited

3

the truck, inadvertently dropped some papers with Leigh Carillo's name on them, which were later recovered by police. The men proceeded to rob the three teenage boys. The boys escaped by telling the men that they saw police coming and, when the assailants looked in that direction, ran home. The boys called the police at 4:57 a.m.

That same morning, Santos Valle and his cousin Miguel Vasquez were standing outside their house talking with their neighbor, Joe Lopez. Joe's friend June Aguilar was in her car outside the house. Sometime between 4:00 and 4:30 a.m., a red Ford pickup truck, with tinted windows and black bar on the back window, drove up and stopped near where the friends were congregating. Three of four men in the truck got out, and the man who got out of the passenger seat was holding a shotgun. Santos managed to escape while the assailants were distracted and ran to his house and called 9-1-1. Meanwhile, the assailants forced Joe to the ground and took his jewelry and cell phone. The man with the shotgun forced June out of her car but did not take her belongings. Another assailant patted down Miguel, who had just returned from his job as a security guard, and took several of his belongings, including his handcuffs, pepper spray, radio, wallet, and badge. The assailants then returned to the truck and drove away. The police were called at 4:41 a.m.

At 5:40 a.m. Travis County Deputy Sheriff Steven Coleman was dispatched to an Austin nightclub. Michael Bishop had been sitting in his car outside the club waiting for his girlfriend to get off work, when a man opened the car's driver door and shoved a shotgun in Bishop's face. The man, who was not wearing anything to cover his face, took Michael's phone, wallet, and some cash from his pocket. A second man wearing a bandana over his face then entered Michael's car through the passenger door and looked for items to take. According to Michael, he noticed a red

4

four-door pickup truck pulled up behind his car with two other men inside, one of whom was shouting for the assailants to hurry. The assailants left in the truck, taking Michael's wallet, keys, cell phone, and lighter. Once they were gone, Michael went inside the club and asked an employee to call 9-1-1. Once Deputy Coleman arrived at the scene, he requested that an emergency "ping" be placed on Michael's stolen phone.[4]

Finally, at 5:58 a.m. APD received a call reporting another robbery. Eduardo Arpero and his cousin, Raando Arpero, had arrived at their jobs at Ginny's Printing shortly before 6:00 a.m. According to Eduardo and Raando, they had just parked and exited their truck when a four-door, Ford pickup truck pulled up behind them. Four men, all wearing masks or bandanas on their faces, were inside the truck. One of the men, who was wearing a red shirt, jumped out of the truck with a shotgun and held it to Raando's head, while telling Raando and Eduardo to get to the ground. Meanwhile two other men opened Eduardo's truck, taking his stereo, keys, and phone. One of the assailants then handcuffed Raando and took his wallet. The handcuffs were later identified by Miguel as looking like the handcuffs that had been taken from him earlier that night. Police also located Michael's wallet near the print shop.

Niess, Frank, Steve, and Servando did not return to the Rodriguez house that morning until after 6:00 a.m. Having located the house through the emergency "ping" on Michael's phone, the police arrived at the house shortly after the group of men returned. The police found Erin's red truck parked outside the house and noticed that the hood was still warm. A SWAT team surrounded

---

[4] At trial, Deputy Coleman explained that a request for a "ping" is made to the cell phone provider and that this "ping" enables authorities, through the use of GPS technology, to determine the location of a cell phone or its direction of travel.

the residence, and the group of four men and two women, including Niess, soon came out of the house. Police subsequently found a red shirt and bandana outside of the house. Police also found items belonging to the victims inside the house and truck, including Miguel's pepper spray, duty belt, bulletproof vest, and radio. Niess was arrested and charged with thirteen counts of aggravated robbery in five separate causes.

## DISCUSSION

**Pretrial Identification**

Prior to trial, Niess filed a motion to suppress evidence of a pretrial photo identification procedure prepared and conducted by the APD.[5] The trial court denied the motion, and at trial six witnesses testified that they had picked Niess out of the photo array. Similarly, five of the victims identified Niess in the courtroom as one of the assailants, after previously identifying him in the photo array. In his first issue, Niess contends that the trial court abused its discretion by admitting evidence of an impermissibly suggestive pretrial photographic identification procedure. Similarly, in his second issue, Niess argues that the in-court identifications of him by five witnesses were "tainted by the impermissibly suggestive photographic spread which gave rise to a substantial likelihood of misidentification at trial."

---

[5] A pretrial photographic identification or "photo array" or "photo spread" occurs when police show a witness photographs of various persons and ask the witness if anyone in the display was the person who committed the offense and, if so, to select the perpetrator's photograph. *See, e.g.*, *Coleman v. State*, 760 S.W.2d 356, 359 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd). A lineup is another type of pretrial identification procedure that occurs when police allow a witness to consider a group of people and ask the witness to identify whether the perpetrator is in the group. *See, e.g.*, *United States v. Wade*, 388 U.S. 218 (1967).

On appeal, we review a trial court's ruling on a motion to suppress evidence based on a claim that an impermissibly suggestive pretrial identification procedure violated the defendant's due process rights under the standard of review set forth in *Guzman v. State*, 955 S.W.2d 85 (Tex. Crim App. 1997). *See Loserth v. State*, 963 S.W.2d 770, 771 (Tex. Crim. App. 1998). Under this standard, we afford almost total deference to a trial court's determination of facts, especially when the trial court's findings are based on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89; *Moore v. State*, 140 S.W.3d 720, 730 (Tex. App.—Austin 2004, pet. ref'd). We afford the same deference to a trial court's determination of mixed questions of law and fact if the resolution of those ultimate questions turns on an examination of credibility and demeanor of the witness. *Guzman*, 955 S.W.2d at 89. However, a trial court's determination of mixed questions of law and fact that do not turn on credibility and demeanor are reviewed de novo. *Id.*

A pretrial identification may not be so suggestive and conducive to mistaken identification that subsequent use of that pretrial identification at trial would deny the accused due process of law. *Barley v. State*, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995) (citing *Stovall v. Denno*, 388 U.S. 293 (1967)). Similarly, an in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008). The test for determining if a pretrial identification procedure is impermissibly suggestive is whether, considering the totality of the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* This is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor. *Loserth*, 963 S.W.2d at 773. Accordingly, we apply a de novo standard of review. *Id.*

7

To determine the admissibility of both pretrial identification and potentially tainted in-court identification we employ a two-step analysis: (1) whether the pretrial identification procedure was impermissibly suggestive; and, if so, (2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Barley*, 906 S.W.2d at 33. The defendant must prove both elements by clear and convincing evidence. *Id*. at 33–34. Only if we determine that the pretrial identification procedure is impermissibly suggestive do we examine whether it tainted the in-court identification. *Id*. at 34.

With regard to the first prong, it is well established that suggestiveness may arise from the manner in which the pretrial identification procedure is conducted or from the content of the resulting photo array itself. *Id.* at 33. Suggestiveness may arise from the manner in which the pre-trial identification is conducted if, for example, police point out the suspect or suggest that a suspect is included in the photo array. *Id*. Whereas, the resulting photo array itself is considered unduly suggestive if, for example, other participants are greatly dissimilar in appearance from the suspect. *Withers v. State*, 902 S.W.2d 122, 125 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (citing *United States v. Wade*, 388 U.S. 218, 232-33 (1967)). However, "neither due process nor common sense requires" that the other pictures used in a photographic array exactly match the defendant's characteristics. *Turner v. State*, 600 S.W.2d 927, 933 (Tex. Crim. App. 1980). Rather, the array must show individuals who fit a rough description of the suspect. *Wilson v. State*, 15 S.W.3d 544, 553 (Tex. App.—Dallas 1999, pet. ref'd). In this case, Niess claims that the photo array was suggestive in both content and the manner in which it was conducted.

We first examine whether the manner in which pretrial identification procedure was conducted in this case was impermissibly suggestive. Niess stresses that the police failed to follow

U.S. Department of Justice guidelines in conducting the pretrial photographic identification.[6] Specifically, Niess argues that the conduct of the pretrial identification procedure was impermissibly suggestive because, in compiling the array, the police improperly sought other images that matched Niess rather than the descriptions given by the victims. Niess also complains that the identification was not conducted in a "double-blind" manner, such that the officer conducting the procedure did not know the identity of the suspect. In addition, Niess argues that APD failed to admonish the witnesses prior to viewing the photos that it was as important to exclude the innocent as to identify the guilty and that the investigation would continue regardless of any identification they made in the process. Niess complains that the identification procedures were not videotaped and that APD has no standard policy for conducting photo identifications and that the police should have conducted a live lineup instead of a photo array because all of the suspects were already in custody at the time.

However, Niess fails to explain how the procedures that he complains of were suggestive and he cites no authority in support of his contention. *See Pacheco v. State*, No. 04-06-00453-CR, 2007 Tex. App. LEXIS 2744, at *11 (Tex. App.—San Antonio Apr. 11, 2007, pet. ref'd) (mem. op., not designated for publication) (rejecting claim that identification procedure was suggestive because police failed to follow U.S. Department of Justice guidelines, noting that appellant failed to provide any authority that techniques were required). While arguably several of the procedures that Niess criticizes are more likely to lead to an impermissibly suggestive

---

[6] At the suppression hearing, the trial court admitted as an exhibit a document entitled *Eyewitness Evidence, A Guide for Law Enforcement*, published in October 2009 by the U.S. Department of Justice, Office of Justice Programs. In part, the document provides recommended procedures for composing and conducting pretrial identifications. *See* http://www.nij.gov/pubs-sum/178240.htm (last visited May 25, 2012).

identification, he has failed to demonstrate that the procedures necessarily led to an impermissibly suggestive line up in this case. For example, while conducting the pretrial photo identification in a "double-blind" manner might minimize the likelihood of impermissible suggestion on the part of the administering officer, without additional evidence that the officer in fact acted improperly in administering the test, such evidence fails to demonstrate that Niess's due process rights were violated.

At the hearing on Niess's motion to suppress, Detective Phillip Hogue testified with regard to how the photo array was compiled and administered. Hogue testified that, using a computer program that shows booking photos, he obtained Niess's most recent booking photo; he then used the photo to compile a line-up, "looking for five other people that matched similar descriptions, builds, facial characteristics of the suspect." Prior to being shown the photos, each witness was read a written admonishment stating:

> This group of photos may or may not contain a picture of the person or persons who committed the crime now being investigated. Keep in mind that hairstyles, beards and moustaches may be easily changed. Also, photographs may not always depict the true complexion of a person– it may be lighter or darker than shown in the photo. Pay no attention to any markings or numbers that may appear on the photo or any other differences in the type of style of the photographs.

Hogue sequentially showed each of the six photos to each witness separately and at separate times, and he testified that he did not in any way suggest which photo the witnesses should select. Based on the record before us, we cannot conclude that there was anything impermissibly suggestive about the manner in which the pretrial photo identification was conducted. *See Mayes v. State*, Nos. 03-10-00101-CR, 03-10-00102-CR, 2011 Tex. App. LEXIS 2075, at *15–16 (Tex.

10

App.—Austin, Mar. 18, 2011, no pet.) (mem. op., not designated for publication) (noting that exact same admonishment was given to victims and concluding that record did not demonstrate that there was anything impermissibly suggestive about manner in which pretrial photo identification procedure was conducted).

Similarly, after viewing the array of photographs from which Niess was selected, we cannot conclude that the resulting photo array itself was impermissibly suggestive. Niess complains that the photo array depicts individuals with different hair styles and facial hair than Niess; with different scars and tattoos than Niess; with different backgrounds and clothing than Niess; and with different races than Niess.

In this case, several of the victims described the assailant with the shotgun as a heavyset Anglo or partially Hispanic male. After reviewing the individual photos in the array from which Niess was selected, we find that the photos depict Hispanic and white males of similar complexion and of approximately the same age and build. All of the men in the array have close-cropped hair styles and light facial hair. In addition, all of the men depicted in the array are wearing crew-neck t-shirts against substantially similar, plain backgrounds. *See Mungia v. State*, 911 S.W.2d 164, 168 (Tex. App.—Corpus Christi 1995, no pet.) (noting that differences in shirt color or photograph background were insignificant and not suggestive). Although only the photograph of Niess depicts a small tattoo and only one photograph in the array depicts a man with a scar, we find that these differences do not render the photo array impermissibly suggestive. At the suppression hearing, Hogue testified that none of the witnesses had mentioned a scar or a tattoo during the pretrial identification procedure, and there was no evidence presented at the suppression hearing

11

suggesting that any witness had informed police that one of the assailants had a tattoo. *See Escovedo v. State*, 902 S.W.2d 109, 118 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (noting that due process does not require that all individuals in pretrial identification array be identical and fact that only one other photograph in array had tattoo tear drop on face did not render the array impermissibly suggestive); *see also Garza v. State*, No. 03-06-00216, 2008 Tex. App. LEXIS 7004, at *6-7 (Tex. App.—Austin Sept. 19, 2008, no pet.) (mem. op., not designated for publication) (concluding that digitally added tattoo did not render photo array impermissibly suggestive and noting that officer testified that witnesses had not commented on tattoo when viewing photos or in identifying appellant).

We hold that Niess has failed to establish that the pretrial identification procedures were impermissibly suggestive. We therefore need not address whether those procedures created a substantial likelihood of misidentification. *See* Tex. R. App. P. 47.1 (court of appeals must hand down opinions that are as brief as possible while addressing those issues necessary to a final disposition). *See also Loserth*, 963 S.W.2d at 772. We overrule Niess's first and second issues on appeal.

**Motion for Mistrial**

In his third issue, Niess contends that the trial court abused its discretion in refusing to grant a mistrial after a witness testified that Niess "had been to jail before."

On direct examination by the State, Erin Moody, who had stayed behind when Niess and the other men left the Rodriguez house, discussed the events of April 17, 2010. Erin testified that she had fallen asleep after the men left and then woke around 5:30 a.m., only to find that the men were still gone. In testifying about her efforts to find the men, the following exchange occurred:

12

PROSECUTOR:        So what else did you do?

MOODY:             I thought they got arrested so I called the jail, and me and Kaitlyn left the house.

PROSECUTOR:        Why did you think that they had gotten arrested?

MOODY:             Because they have all been to jail before.

Niess's attorney immediately objected, and upon the court's sustaining his objection, moved for a mistrial. The trial court denied Niess's motion for a mistrial, but instructed the jury to ignore the witness's comment. Niess now argues that Erin's testimony was prejudicial because it implied that Niess and the other men "were a gang of outlaws" and that the only appropriate remedy was for the court to grant a mistrial.

We review a denial of a motion for mistrial for an abuse of discretion. *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). In general, improper witness testimony, such as a witness's inadvertent testimony referring to or implying extraneous offenses, can be rendered harmless by a prompt instruction to disregard. *Simpson*, 119 S.W.3d at 272; *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992). Exception to this general rule exists only in those extreme cases where it appears that the testimony was "clearly calculated to inflame the minds of the jury or was of such damning character as to suggest that it would be impossible to remove the harmful impression from the jury's mind." *Rojas v. State*, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998).

Assuming that the testimony at issue was improper, the record shows that the trial court immediately instructed the jury to disregard it. Further, there is no evidence suggesting that the jury was unable to comply with that instruction. Viewing the record in the light most favorable to the trial court's ruling, we find that the trial court could have reasonably concluded that Erin's testimony was not so inflammatory as to be incurable by instruction. Accordingly, we cannot conclude that the trial court abused its discretion in denying Niess's motion for a mistrial. We overrule Niess's third issue on appeal.

**Judgment Modification**

Finally, we address Niess's contention that the judgment in trial court cause number D-1-DC-10-900336 should be corrected. Specifically, Niess argues that the judgment of conviction in this cause incorrectly reflects a finding of guilt and a corresponding thirty-year sentence with respect to count three, concerning Ramiro Garcia. Niess requests that we modify the judgment to properly reflect that he was acquitted of this count. The State agrees that we should modify the judgment as Niess requests.

If the oral pronouncement of a sentence and the written judgment vary or conflict, the oral pronouncement controls. *Thompson v. State*, 108 S.W.3d 287, 290 (Tex. Crim. App. 2003). Here, the record shows that after both sides had rested and closed, Niess moved for an instructed verdict with respect to the count concerning Ramiro Garcia. The trial court granted the motion, stating, "You have a request for an instructed verdict as to cause number D-1-DC-10-900336, count three, alleging an offense against Ramiro Ramirez Garcia is granted. There will not be a

14

submission, and the Court finds jeopardy has attached and so it will show acquittal." Having reviewed the record, we agree that the record establishes that Niess was acquitted of count three in cause number D-1-DC-10-900336. Because the judgment of conviction incorrectly reflects that Niess was found guilty of this count, we sustain his fourth issue on appeal.

An appellate court has the power to correct certain clerical errors in a trial court's judgment if the appellate court has the information necessary to do so. Tex. R. App. P. 43.2.(b); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *see also Boone v. State*, No. 03-10-00440-CR, 2011 Tex. App. LEXIS 5957, at *1 (Tex. App.—Austin July 28, 2011, no pet.) (mem. op., not designated for publication). We conclude that we have the necessary information to correct the error in the trial court's judgment in this case. *See Thompson*, 108 S.W.2d at 290 (noting that remedy when written judgment conflicts with oral pronouncement is to correct written judgment). Having sustained Niess's fourth issue on appeal, we modify the trial court's judgment adjudicating guilt as to count three in trial court cause number D-1-DC-10-900336 to reflect that Niess was acquitted of this count.

**CONCLUSION**

We have overruled Niess's first, second, and third issues on appeal and sustained Niess's fourth issue on appeal, requesting that we modify one of the judgments of conviction. Accordingly, the judgment of conviction with respect to cause number D-1-DC-10-900336 is affirmed as modified, and the remaining judgments of conviction are affirmed.

15

_____

Diane M. Henson, Justice

Before Justices Puryear, Henson and Goodwin

NO. 03-11-00213-CR Affirmed

NO. 03-11-00214-CR Affirmed

NO. 03-11-00215-CR Affirmed

NO. 03-11-00216-CR Affirmed

NO. 03-11-00217-CR Modified and, As Modified, Affirmed

Filed:   June 21, 2012

Do Not Publish