

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-15-00373-CR

GERONIMO SCOTT AGUILAR                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

## FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 1327533D

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Geronimo Scott Aguilar appeals his convictions for two counts of aggravated sexual assault of a child under fourteen years of age, three counts of sexual assault of a child under seventeen years of age, and two counts of indecency with a child by contact. In four issues, Aguilar argues that the trial

---

[1]See Tex. R. App. P. 47.4.

court abused its discretion by admitting evidence of extraneous bad acts and testimony that allegedly constituted backdoor hearsay. Although Aguilar's four issues are thoroughly briefed, our review of the record reveals—as argued by the State—that Aguilar's alleged errors were not preserved in the trial court for our review; accordingly, for the reasons set forth below, we will affirm.[2]

## II. BACKGROUND[3]

When Aguilar was around eighteen or nineteen years old, he got involved in the music ministry and youth ministry at Set Free in Anaheim, California. While with Set Free, Aguilar met the complainant's mother and stepfather and later moved in with them and their three daughters. Aguilar would sleep on the couch behind the eleven-year-old complainant, "spooning" with her while his penis was erect.

When Aguilar's uncle asked him to move to Texas to perform music for Kenneth Copeland Ministries, Aguilar agreed. While Aguilar was volunteering with Kenneth Copeland Ministries, he worked on staff with a ministry called New Beginnings. Aguilar talked to the pastor of New Beginnings about opening up a rehab home for the addicts that they were ministering to and volunteered the complainant's mother to oversee a women's rehab home. The pastor gave his

---

[2]Aguilar's appellate attorneys are not the same attorneys who represented him at trial.

[3]Because Aguilar does not challenge the sufficiency of the evidence to support his convictions, we include only a brief background here. Additional facts, when necessary, are set forth under each issue.

blessing, and the complainant's family moved to Fort Worth in August 1996 when the complainant was thirteen years old. Within a few months, the pastor of New Beginnings was unhappy with the way that the complainant's mother was running the women's rehab home, so Aguilar and his wife moved into the women's rehab home with the complainant's family to help oversee it.

While Aguilar's wife was on a trip to California, Aguilar took the complainant and her eleven-year-old sister to a house owned by someone affiliated with New Beginnings and played strip poker with them. On various occasions, Aguilar "dry humped" the complainant while they both had clothes on. Aguilar and the complainant also often watched movies together, including *Lolita* and *Great Balls of Fire*.

On Halloween night in 1996, Aguilar came into the complainant's bedroom and had sex with her. The complainant was thirteen years old at the time. After that night, Aguilar and the complainant had "a lot of sex in a lot of different places."

When Aguilar, his wife, and the complainant's family left New Beginnings and moved to a house in Grapevine, Aguilar and the complainant continued to have sex, though it was less frequent. The complainant recounted a conversation that took place in Aguilar's bedroom in Grapevine when "[h]e was crying, and he was on his knees, and begging [the complainant] to forgive him and he was so sorry, he loved [her]."

3

After Aguilar and his wife moved to another house and after the complainant's family moved to Euless, Aguilar continued to have contact with the complainant; he picked her up and took her to motels so that they could have sex. The last memory that the complainant had of Aguilar was when he picked her up, took her to his house in Forest Hill, and had sex with her there. The complainant said that she had sex with Aguilar beginning on Halloween night in 1996 and continuing through 1997 when she was almost fifteen years old.[4]

In September 1998, Aguilar and his wife moved to Richmond, Virginia, where he ultimately started his own ministry. As Aguilar's ministry grew, he "lost his way," and by 2006 or 2007, he was involved in a number of extramarital affairs with parishioners and with females on staff at his ministry. When rumors of the affairs came to light, C.H., a sixteen-year-old girl who was on Aguilar's staff and with whom Aguilar had an inappropriate relationship, confronted Aguilar about the affairs.

The complainant learned that C.H. wanted to come forward with her allegations against Aguilar, and that convinced the complainant to come forward with her allegations against Aguilar that dated back to 1996 and 1997.

Based on the complainant's allegations, Aguilar was indicted in 2014, and after a five-day trial, the jury convicted Aguilar of two counts of aggravated sexual assault of a child under fourteen years of age, three counts of sexual assault of a

_____

[4]The complainant was born in January 1983.

child under seventeen years of age, and two counts of indecency with a child by contact. The trial court sentenced Aguilar to forty years' imprisonment on each of the two counts of aggravated sexual assault, to twenty years' imprisonment on each of the three counts of sexual assault, and to twenty years' imprisonment on each of the two counts of indecency and ordered the seven sentences to run concurrently. Aguilar then perfected this appeal.

### III. NO ABUSE OF DISCRETION SHOWN REGARDING THE ADMISSION OF THE COMPLAINED-OF EVIDENCE

In his first three issues, Aguilar argues that the trial court abused its discretion by admitting evidence of extraneous bad acts. In his fourth issue, Aguilar argues that the trial court abused its discretion by admitting testimony that allegedly constituted backdoor hearsay. We discuss each of these evidentiary challenges below.

### A. Standard of Review

We review a trial court's decision to admit evidence, as well as its decision regarding the relative weight of the probative value of the evidence, under an abuse-of-discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010), *cert. denied*, 536 U.S. 727 (2011); *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009). "The rules of evidence favor the admission of relevant evidence and carry a presumption that relevant evidence is more probative than prejudicial." *Kirk v. State*, 421 S.W.3d 772, 782 (Tex. App.—Fort Worth 2014, pet. ref'd). As long as the trial court's ruling falls within

5

the zone of reasonable disagreement, we will affirm the trial court's judgment. *Martinez*, 327 S.W.3d at 736; *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

## B.  The Law on Preservation of Error

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.  Tex. R. App. P. 33.1(a)(1); *Douds v. State*, 472 S.W.3d 670, 674 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1461 (2016).  A party must continue to object each time the objectionable evidence is offered. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Clay v. State*, 361 S.W.3d 762, 766 (Tex. App.—Fort Worth 2012, no pet.).  Any error in the admission of evidence is cured when the same evidence comes in elsewhere without objection.  *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003).

Most complaints, "whether constitutional, statutory, or otherwise, are forfeited by failure to comply with Rule 33.1(a)."  *Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004).  A reviewing court should not address the merits of an issue that has not been preserved for appeal.  *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009).

## C. Analysis of Complaints Regarding the Admission of Evidence of Extraneous Bad Acts

### 1. Testimony that Aguilar Had an Inappropriate Relationship with C.H.

In the defense's case in chief, Aguilar was asked whether there was "ever any time that [he] ever had any inappropriate sexual contact with [the complainant]," and he responded, "No, sir, never ever in my life and never even [been] accused of having sex with a child until this [case]." On cross-examination, the State asked Aguilar without objection whether he had fondled C.H. and whether he had touched her breasts or her vagina; Aguilar denied any such touching of C.H. other than giving her hugs. The State then called C.H. to testify on rebuttal. C.H. testified without objection that Aguilar had expressed feelings for her when she was sixteen years old[5] and had told her to let him know when she was ready for sex and where she wanted to meet and that he would be there. C.H. further testified that her relationship with Aguilar progressed from hugs, to a peck on the lips, and to kissing with tongues and that he then started touching her butt and her breasts under her bra and "dry humped" her on her "privates." When C.H. heard rumors about Aguilar's affairs with other women, she confronted Aguilar about the affairs and told him that she was mad at him for bringing her into this "sick, twisted relationship in the first place"; Aguilar started

---

[5]C.H. testified that she was born in July 1993; she would have turned sixteen years old in 2009. Aguilar testified that he was born in February 1970; thus, Aguilar would have been thirty-nine or forty years old when C.H. was sixteen years old.

"bawling," apologized, and admitted that he had a problem. Several weeks later, C.H. told her godparents that Aguilar had touched her inappropriately. C.H.'s godfather testified without objection that after he confronted Aguilar about what he had done to C.H., Aguilar went to counseling.

In his second issue, Aguilar argues that the trial court abused its discretion by permitting the State to question him, C.H., and her godfather about his inappropriate sexual contact with C.H. on the basis that the State was allowed to clear up the false impression Aguilar had created during his testimony—that he had never had inappropriate sexual contact with the complainant or any other child. Aguilar cites to over sixty pages of the record without pointing to a specific overruled objection that forms the basis of his complaint on appeal.

We have reviewed C.H.'s entire testimony and note that of the five objections made by the defense, one objection was sustained before the answer was completed, and no adverse ruling was pursued; three objections were general objections that preserved nothing for review; and one leading-relevancy objection about whether Aguilar was crying was not re-urged later when C.H. testified about Aguilar bawling. Because Aguilar did not lodge specific objections to the bulk of C.H.'s detailed testimony about their relationship and because evidence of Aguilar's reaction to being confronted came in later without objection, no complaint to C.H.'s testimony regarding Aguilar's inappropriate relationship with her is preserved for our review. *See* Tex. R. App. P. 33.1; *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) (holding appellant's failure to object

8

to witness's testimony at trial waived appellate review of any error associated with witness's testimony), *cert. denied*, 555 U.S. 1105 (2009); *Valle*, 109 S.W.3d at 509–10 (holding any error in the admission of the objected-to testimony was cured when the same or similar evidence came in elsewhere without objection). Moreover, to the extent Aguilar complains that the trial court erred by overruling unspecified objections during his testimony and C.H.'s godfather's testimony about Aguilar's relationship with C.H., any error in overruling such unspecified objections was cured when the same or similar evidence came in without objection during C.H.'s testimony. *See Valle*, 109 S.W.3d at 509–10. Accordingly, we overrule Aguilar's second issue.

## 2. Testimony Regarding the Complainant's Motivation to Come Forward

In his first issue, Aguilar argues that the trial court abused its discretion by admitting evidence that the complainant came forward with her allegations against Aguilar only after hearing that there was a sixteen-year-old girl from Virginia—C.H.—who wanted to come forward with allegations against Aguilar. The State responds that resolution of Aguilar's second issue moots his first issue. We agree. Because we have held that no complaint to C.H.'s testimony regarding Aguilar's inappropriate relationship with her was preserved for our review and because C.H.'s testimony was more detailed than the complainant's testimony about C.H.'s desire to come forward, any error in admitting the complainant's testimony that she came forward after learning that C.H. wanted to come forward was cured. *See id.* We overrule Aguilar's first issue.

9

### 3. Testimony that Aguilar Had Extramarital Affairs

During the State's case in chief, Aguilar sought to expose the bias of two of the State's witnesses—Jamie Chasteen and Amber Baker—by asking about their affairs with him. On redirect, the State questioned both witnesses about the details of the affairs.

Additionally, during Aguilar's case in chief, his wife Samantha testified that his affairs were exposed in 2012 or 2013, a former parishioner named Melissa Dixon testified that Chasteen had admitted to her that she had an affair with Aguilar, and Aguilar testified in his own defense and admitted that he had engaged in several affairs. The State cross-examined Samantha, Dixon, and Aguilar about his affairs.

In his third issue, Aguilar argues that the trial court abused its discretion by admitting the details of his extramarital affairs through his testimony as well as the testimony of Chasteen, Baker, Samantha, and Dixon because such testimony went beyond the scope of the evidence that defense counsel had elicited and was not relevant. We will evaluate the testimony of each of these witnesses below.

### a. Jamie Chasteen

With regard to Chasteen, Aguilar argues that the trial court abused its discretion by permitting her to testify, over defense counsel's relevance objection, that Aguilar once described her during sex as "look[ing] like a 12-year-old" and that Aguilar compared their relationship to the movie *Lolita*. The record

demonstrates that Aguilar's comment about Chasteen "look[ing] like a 12-year-old" referred to the fact that her makeup came off during sex; Chasteen was not a minor but rather twenty-three years old when she first had sex with Aguilar. Aguilar cites no case law, and we have found none, in which making a comment similar to his or watching *Lolita* with a woman in her twenties constitutes evidence of an extraneous bad act. Moreover, earlier in the State's case in chief, the complainant had testified without objection that she and Aguilar had watched *Lolita* together and that she had noticed that there were similarities between the movie and her relationship with Aguilar. Because this evidence—which is similar to but more damaging than the complained-of evidence—came in without objection, any error in overruling Aguilar's objection to the State's redirect examination of Chasteen on this topic was cured. *See Valle*, 109 S.W.3d at 509–10.

### b. Amber Baker

With regard to Baker, Aguilar cites to four pages of the record during which the State questioned her on redirect about her affair with Aguilar and elicited testimony that he had also had an affair with Baker's mother. Aguilar did not object to this testimony, and there was no running objection in place. Thus, no complaint about Baker's testimony regarding her affair with Aguilar and his affair with her mother is preserved for our review. *See* Tex. R. App. P. 33.1; *Fuller*, 253 S.W.3d at 232.

11

### c. Samantha Aguilar

With regard to Samantha's testimony, Aguilar complains about the State's questioning on pages 123 through 137 of volume 9 of the reporter's record. The fifteen cited pages contain twelve objections. Of those twelve objections, Aguilar specifically challenges on appeal only one objection that was overruled—"I object to the specificity of the affairs now that the affairs have been acknowledged. Now I assume we're going to go through them one at a time"—which was urged in response to the State's question about whether Samantha knew that her husband had an affair with Baker. Any error in the admission of Samantha's testimony about Aguilar's affair with Baker was harmless because the same evidence was previously admitted by Aguilar during his cross-examination of Baker. *See Valle*, 109 S.W.3d at 509–10.

### d. Melissa Dixon

With regard to Dixon's testimony, Aguilar argues generally that "the State freely cross-examined her about several other affairs" and cites us to six pages of the record. On those six pages, only two objections appear, both of which were sustained by the trial court. Dixon did not give answers to the two objectionable questions. Aguilar thus fails to identify any objectionable evidence that came in as a result of the State's cross-examination of Dixon.

### e. Aguilar

With regard to his own testimony, Aguilar cites to pages 96, 97, 140, 146, 184, 191 to 193, and 203 to 204 of volume 10 of the reporter's record and argues

that the State relentlessly questioned him about the details of his extramarital affairs. Of the pages cited by Aguilar, pages 96, 97, 140, and 184 contain no objections. Page 146 contains an objection regarding a repetitive question, which was made and sustained after Aguilar answered; no motion to strike or disregard was made. Pages 191 to 192 contain an overruled objection to the question regarding how many women Aguilar brought to the parsonage to have sex.[6] After Aguilar answered the question, the State asked three related follow-up questions, and Aguilar failed to object to those questions. Thus, any error in overruling Aguilar's objection to the State's question about how many other women he had sex with in the parsonage was cured. *See Valle*, 109 S.W.3d at 509–10. On pages 203 to 204, the State asked Aguilar about his presence at a slumber party where minors were in attendance, and Aguilar answered the question in the negative before his attorney objected that the question was cumulative, prejudicial, and "beyond any remote relevance to the case." The untimely objection preserved nothing for our review. *See* Tex. R. App. P. 33.1(a); *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008) (holding untimely objection, which was made after the question was asked and answered, did not preserve error for appeal), *cert. denied*, 558 U.S. 883 (2009).

---

[6]Page 193 contains a sustained objection to the question of who else Aguilar had sex with outside of his marriage. Because Aguilar did not answer this question, no objectionable evidence came in.

13

### f. Disposition of Issue 3

Having reviewed each of the portions of the record cited by Aguilar during which he and four witnesses testified about his extramarital affairs and having determined that no error occurred or that no error was preserved for our review, we overrule Aguilar's third issue.[7]

### D. Analysis of Complaint Regarding Alleged Backdoor Hearsay

During its case in chief, the State called Elinor Lutine Martinez (Lou), who knew Aguilar when he ministered in Fort Worth. The State questioned Lou about a frantic call that she received from the complainant's mother in the middle of the night sometime in 1997. Lou testified without objection that after she convinced the complainant's mother to calm down, the information she received from the complainant's mother "blew [her] mind a little." The following colloquy then transpired:

> Q. Based upon what she [the complainant's mother] told you, without saying what she said, did you give her instructions on what she needed to do?
>
> A. I asked her what her plans were.
>
> [DEFENSE COUNSEL]: Objection. Objection. Objection.

---

[7]Aguilar also argues that harm from the alleged errors in his first three issues should be considered cumulatively. Because we have held in each of his first three issues that no error occurred or that no error was preserved for our review, there is no harm or not enough harm to accumulate. *See Murphy v. State*, 112 S.W.3d 592, 607 (Tex. Crim. App. 2003) ("Because we have found little or no error in the above-alleged points, there is no harm or not enough harm to accumulate."), *cert. denied*, 541 U.S. 940 (2004).

THE COURT: Okay.

[DEFENSE COUNSEL]: Without knowing what was said, the instructions would imply the answer to what was said, which is not permissible. We don't know, so that's a backdoor hearsay, and I just object to that. Her giving instructions is not relevant to the case.

A bench conference followed, during which the parties explained what testimony might be elicited in response to the question set forth above, and the trial court ultimately overruled defense counsel's backdoor hearsay objection. The State then resumed its questioning of Lou:

Q. (By [PROSECUTOR]) Ms. Martinez, what instructions did you give to [the complainant's mother] with how she needed to proceed?

[DEFENSE COUNSEL]: Object, Your Honor, for the record.

THE COURT: All right. Your objection is noted, and it's overruled.

THE WITNESS: Do I answer?

Q. (By [PROSECUTOR]) Yes, ma'am. Yes, ma'am.

A. I told her, "You have to report this; you do know that."[8]

On the following page of the record, the State asked Lou without objection whether she saw anything being done by authorities—such as law enforcement or CPS—with regard to the victim, and Lou said, "No . . . [nothing]." Lou testified

---

[8]Although Aguilar contends on appeal that Lou advised the complainant's mother to call Child Protective Services, the record reflects that Lou told the complainant's mother only that she had "to report this."

15

without objection that because nothing was being done, she called Pastor Zaragoza, who was involved with Aguilar's ministry.

Pastor Zaragoza testified that after he received the phone call from Lou, he immediately called Aguilar and told him that they needed to have a meeting "now." When Aguilar came to Pastor Zaragoza's house, Pastor Zaragoza confronted him about the information he had received from Lou and told him that they needed to do what was right for the girls and what was right for Aguilar, including that Aguilar needed to get help. Pastor Zaragoza testified without objection that in response to being confronted, Aguilar "became extremely distraught, began to weep, cry" and grabbed Pastor Zaragoza's knee and said over and over, "I don't want to go to jail over this."

In his fourth issue, Aguilar argues that the trial court abused its discretion by admitting Lou's testimony because it allegedly constitutes backdoor hearsay that corroborates the complainant's accusations. As set forth above, the record reflects that more explicit evidence than the complained-of evidence came in later without objection through Pastor Zaragoza. Accordingly, any error in overruling Aguilar's backdoor-hearsay objection was harmless. *See Valle*, 109 S.W.3d at 509–10; *see also Burks v. State*, 876 S.W.2d 877, 898 (Tex. Crim. App. 1994) (holding that erroneously admitted backdoor hearsay was harmless because other testimony proved the same facts), *cert. denied*, 513 U.S. 1114 (1995). We therefore overrule Aguilar's fourth issue.

16

## IV. Conclusion

Having overruled each of Aguilar's four issues, we affirm the trial court's judgments.

PER CURIAM

PANEL: WALKER, MEIER, and SUDDERTH, JJ.

SUDDERTH, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 6, 2017