**Opinion issued April 16, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————————

**NO. 01-19-00425-CR**

————————————————

**JO ANN WILBERT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 426th District Court**
**Bell County, Texas\***
**Trial Court Case No. 77530**

---

\*   Pursuant to the Texas Supreme Court's docket-equalization powers, this appeal was transferred from the Third Court of Appeals to this court on June 11, 2019. *See* TEX. GOV'T CODE § 73.001; Order Regarding Transfer of Cases from Courts of Appeals, Misc. Docket No. 19-9040 (Tex. June 5, 2019). We are unaware of any conflict between the precedent of that court and that of this court on any relevant issue. *See* TEX. R. APP. P. 41.3.

## MEMORANDUM OPINION

Jo Ann Wilbert appeals from her conviction for capital murder. She argues that the evidence is legally insufficient to show that she paid or offered to pay another to kill the victim. Wilbert also argues that the trial court erred in allowing the state to introduce evidence that she was motivated in part by racial animus. We affirm.

## BACKGROUND

Andrew Hardesty ambushed Christine Watkins in front of her home in October 2014, shooting her 12 times with a pistol. Watkins died at the scene. Hardesty was convicted of capital murder. *See Hardesty v. State*, No. 03-18-00546-CR, 2019 WL 4068564 (Tex. App.—Austin Aug. 29, 2019, pet. ref'd) (mem. op.).

A grand jury also indicted Jo Ann Wilbert for capital murder in connection with Hardesty's shooting of Watkins. The indictment alleged that she remunerated or agreed to remunerate Hardesty for the murder of Watkins. *See* TEX. PENAL CODE § 19.03(a)(3). Wilbert pleaded not guilty and was tried by a jury.

The victim's husband, Kenneth Watkins, testified that Wilbert lived across the street from the Watkins family (Kenneth and Christine) in Killeen. For a time, Wilbert and Christine were friends. But their relationship soured.

Kenneth and his wife owned two other houses in the neighborhood that they rented to others. One of these houses was behind Wilbert's home. Kenneth testified that Wilbert objected to the tenants in that house because they were Hispanic.

2

Wilbert referred to them as "illegal immigrants." She told the Watkins family that they would regret renting to these tenants for the rest of their lives if they did so.

The other house that the Watkins family owned was next door to Wilbert's home. The Watkins family and Wilbert became embroiled in a property dispute after Wilbert tore down a privacy fence between the two homes. Wilbert sued the Watkins family in small claims court. The Watkins family won that suit. Afterward, Wilbert began making complaints to local authorities about ostensible housing code violations committed by the Watkins family.

Wilbert put up a sign in her yard that faced the Watkins' home. The sign depicted a middle finger. Before Halloween, Wilbert put up a headstone in her yard that bore Christine's name.

After floodlights in their yard subsequently went missing, the Watkins family bought and installed security cameras outside their home. But someone began reorienting the cameras so that they would not be able to record trespassers. Someone also cut the wires to one camera. The Watkins family then experienced an attempted break-in during which the intruder pried a window open and tried to set the curtains on fire.

About a week after the attempted arson, Christine was murdered. One morning as she was leaving for work, Kenneth accompanied her outside to move his

truck out of the way. He heard his wife exclaim, "oh no" and then heard gunshots. Kenneth fled to his son's nearby home for help and summoned law enforcement.

J. Munden, an officer with the Killeen Police Department, was the first to arrive at the scene. When he arrived, Christine was dead. Multiple casings lay nearby.

Munden saw that the Watkins family had security cameras and reviewed the video footage. It showed a man, later identified as Andrew Hardesty, approach and shoot Christine multiple times. This footage subsequently was played for the jury.

Christine's body was autopsied. The medical examiner who performed the autopsy, Dr. Stephen Hastings, testified that she sustained 12 gunshot wounds. He recovered several bullets as well as some bullet fragments from her body.

N. Holtzclaw was one of the detectives with the Killeen Police Department assigned to investigate Christine's murder. At the scene, he collected the shell casings and several bullets that had been fired. The casings were for a .40-caliber pistol.

T. Kaiser was the lead detective assigned to the case. During the investigation, he learned of the dispute between Wilbert and the Watkins family. In particular, a man named John Horn spoke with Kaiser about Wilbert's lawsuit against the Watkins family and Wilbert's animosity toward Christine. Detectives did not discover any disputes between Christine and others.

Kaiser testified that detectives eventually learned of Hardesty's possible involvement in the murder through Billy Jack Phillips. Hardesty's name had not previously come up in the investigation. Hardesty did not have any known connection with Christine. Phillips also pointed detectives to several others who had information, including Julia Driskell, Greg Pickens, and Jermie Romel.

John Horn testified that he met Wilbert in 2013. At the time, he was a handyman and he worked for her on home-improvement projects. As he worked for Wilbert, they became friends. Horn had a romantic interest in Wilbert, but his feelings were unrequited. During this period, Horn learned of Wilbert's lawsuit against the Watkins family. He testified that Wilbert wanted him to lie for her in court in that suit.

Horn stated that Wilbert had written him several letters, one of which concerned Horn's unwillingness to testify in the lawsuit. The letter, which was admitted into evidence stated:

> I know you don't want to testify in court but I paid you good money, I treated you good and you are going to keep up your end of the bargain. You need to testify against the n***** or I will subpoena you . . . .[1]

By "the n*****," Wilbert meant Christine.

---

[1] The racial slur in the letter is familiar to the reader and is commonly referred to as the N-word. Throughout the opinion, we substitute n***** for the actual word.

Horn testified that Wilbert, who is Caucasian, often expressed her dislike of Christine, who was African-American, in racist terms:

Q.        What would she say about Christine Watkins?

A.        Hateful. Didn't—didn't want a black person around her.

[Defense]:  Objection, Your Honor.

A.        Just a bad neighbor.

[Defense]:  Objection; 404(a).

[State]:    This goes to motive.

[Court]:    I'll overrule the objection.

Q.        Was there any names in particular she used to call Jo Ann Wilbert—I'm sorry, Jo Ann Wilbert would call Christine?

A.        It's offensive. The N word.

Q.        All right. And it's a word we don't like to say.

A.        I don't like it either.

Q.        All right. But, for the record, what would Jo Ann Wilbert refer to Christine Watkins as?

A.        As a n*****.

Wilbert asked Horn if he knew anyone in the Ku Klux Klan "that wouldn't mind getting rid of a black person." Except, he said, Wilbert used the slur "n*****." Horn testified that he did not know anyone in the Klan. He thought she may have got the

6

wrong idea about him and his beliefs because he flew the Confederate Battle Flag at his home.

Horn also testified about a time when he and Wilbert visited a museum exhibit in Comanche, Texas. He said that Wilbert introduced him to the Klan's "Imperial Grand Wizard" for the area. It was at this point, Horn said, that he realized Wilbert was serious about having Christine murdered. While Wilbert never specifically mentioned payment for having Christine murdered, Horn testified that Wilbert said that she would make it worth someone's while. He understood her to mean money. After the museum visit, Horn cut off all contact with Wilbert and informed the police chief of Nolanville, where Horn lived, that Wilbert intended Christine harm.

On cross-examination, Horn conceded that he did not keep all the letters that Wilbert sent to him, even though in some of the others Wilbert purportedly asked for help finding someone to murder Christine.

Hardesty's ex-girlfriend, Julia Driskell, testified. Their relationship spanned eight or nine years, and they had two children together.

According to Driskell, a friend, Jack Dutton, helped Hardesty find work. Hardesty eventually began working for a woman named "Jo Ann." Driskell saw Jo Ann when she would come to their home to pick up Hardesty. Driskell was able to identify Wilbert as the Jo Ann in question both to the police and in court.

7

Hardesty told Driskell that he did home-improvement projects for Wilbert, but Driskell did not believe him due to the odd hours that he kept. Hardesty claimed, for example, to be painting her house at 7:00 in the evening. He did not always come home at night; sometimes he would not return for days. In addition, Hardesty had not worked as a painter before. And he would wear all black clothes when working for Wilbert. Driskell stated that Wilbert purchased these clothes for him.

Wilbert also bought Hardesty a pistol from a pawnshop.

Hardesty later told Driskell that Wilbert "wanted help with her neighbor." He said that Wilbert had paid him to start "a fire in a front room" of this neighbor's house and that he had done so. Hardesty also told Driskell that Wilbert had hired him to kill this neighbor. Driskell did not believe Hardesty at the time because "he talked about killing people all of the time." After Hardesty killed Wilbert's neighbor, however, he told Driskell that Wilbert still owed him money. Later, Driskell was on a phone call between Hardesty and Wilbert, in which Wilbert acknowledged that she still owed Hardesty money but said she did not want to wire or mail it to him because these payments could then be traced back to her.

Driskell testified that, after Christine's murder, Hardesty gave the pistol to a friend, Greg Pickens, as collateral for a personal loan.

Driskell agreed that Hardesty had begun using methamphetamine before the murder and that he had become violent after he began using the drug. Driskell agreed

8

that she did not cooperate with law enforcement at first. She explained that she "didn't want to be involved." She also seemed to concede that she probably did not recall Jo Ann's name until the police mentioned it to her. In terms of her out-of-court identification of Wilbert, Driskell did not think the police had shown her a photo array or line up.

Pickens testified after Driskell. He stated that he loaned her and Hardesty money so that they could get their water turned back on in late 2014. Hardesty gave Pickens a pistol "to hold until he paid" the debt. Hardesty tried to recover the pistol several times without paying back the loan. But Pickens rebuffed Hardesty's attempts to do so. The police eventually came and took possession of the pistol.

On cross-examination, Pickens described Hardesty as having "PTSD" and said that Hardesty "gets agitated a lot." On one occasion, Hardesty spontaneously told Pickens that he wanted to shoot somebody.

Detective K. Tramp of the Killeen Police Department was the officer who retrieved the pistol from Pickens. It was a .40-caliber pistol and had 10 bullets in its magazine. These bullets were the same brand and caliber as those found near Christine's body.

D. Jones, an agent with the Bureau of Alcohol, Tobacco, and Firearms, confirmed that Wilbert had bought this pistol from Action Pawn in Killeen in October 2014. Records showed that this was the same pistol as the one used to

9

murder Christine. Michael Clouse, an employee of Action Pawn, also testified that Wilbert bought the pistol in question based on records the pawnshop maintained. Wilbert also bought a box of .40-caliber ammunition for the pistol. Other evidence admitted at trial showed that the pistol had not been reported as stolen.

The state also called Nick Brizendine, who was employed by the Department of Public Safety's crime lab as a firearm examiner. He test fired the pistol obtained from Pickens, compared the results with the bullets and bullet fragments recovered from the autopsy of Christine's body, and concluded that several of them had been fired from the pistol. The remainder either could not be excluded as having been fired from the pistol or were not suitable for comparison to the bullets that Brizendine test fired from the pistol.

Billy Jack Phillips testified that he knew Hardesty and Driskell well. According to Phillips, Hardesty suffered from PTSD due to his failure to deploy to Afghanistan with his unit, which suffered casualties for which Hardesty felt guilty or responsible. Phillips said that in the months leading up to the murder of Christine, Hardesty was using methamphetamine daily and had become violent with Driskell.

In a conversation that Phillips had with Hardesty before the murder, Hardesty told Phillips that a woman had hired Hardesty to make another woman move out of the neighborhood. Hardesty said that he had tried to accomplish this by starting a fire at this other woman's home, but the fire had not scared her away. So Hardesty's

job ultimately was to kill this other woman "in exchange for whatever they agreed upon." Hardesty told Phillips that the woman who hired him had given him two pistols. Phillips did not believe Hardesty. According to Phillips, Hardesty was a fabulist who often told improbable or outlandish lies, such as that he had been a sniper deployed to Afghanistan on secret missions and that he was required to register his hands as lethal weapons in another state.

Phillips later came to believe Hardesty about the murder, however, after speaking with Jack Dutton. Phillips knew Dutton through Hardesty and Driskell. Dutton corroborated Hardesty's story. According to Dutton, a woman named "Jo Ann" approached Dutton about the job. Dutton said that he and Hardesty tried to scare the neighbor away with a fire and that Hardesty "ended up taking the contract to go kill her." After the murder, Dutton told Phillips that Hardesty did it. Dutton said that he acted as the middleman between Hardesty and Jo Ann and that Jo Ann had paid Hardesty. Phillips characterized his conversation with Dutton as a deathbed confession, as Dutton died within a week of disclosing his role in the murder.

Phillips also testified that Hardesty later confessed to him.

Jermie Romel also testified. Romel began using methamphetamine with Dutton, who introduced Romel to Hardesty. Romel and Hardesty were not close but they too used meth together. Hardesty told Romel "that there was a lady that hired him through Jack Dutton to do a job, never got paid for the job and that this lady had

then taken off for Florida." Hardesty said that the job was to shoot a woman dead. Romel did not know the employer's name. Hardesty said he was going to find her "and get his payments one way or another." Romel stated that Hardesty "would just talk about it multiple times, over and over and over again because he was so upset about it." Specifically, Hardesty was upset about not being paid what he was owed. Romel had discounted the story. Like Phillips, Romel testified that Hardesty was a fabulist.

On cross-examination, Romel acknowledged that he had given two separate statements to detectives. In the first one, he referred solely to harassment designed to force the neighbor woman to move, not a murder for hire. Romel gave the second statement, which did refer to murder for hire, only after he had been arrested for felony possession of methamphetamine.

When law enforcement authorities arrested Wilbert, she was in Florida.

The defense did not call any witnesses.

The jury found Wilbert guilty. The trial court assessed her punishment at confinement for life without the possibility of parole.

## DISCUSSION

### Sufficiency of the Evidence

Wilbert contends that the evidence is legally insufficient to support the jury's finding that she hired Hardesty to murder Christine for money. Wilbert argues that

12

a reasonable jury could not have found proof of payment beyond a reasonable doubt because the testimony about pay lacked sufficient corroboration.

### *Standard of Review*

In legal-sufficiency review, we view all the evidence in the light most favorable to the prosecution and determine whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018). Our review includes both properly and improperly admitted evidence. *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016). The jury is the lone arbiter of the weight of the evidence and witness credibility. *Id.* We defer to the jury's resolution of evidentiary conflicts and the inferences drawn from the evidence as long as the inferences are reasonable ones supported by the evidence rather than mere speculation. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). Direct and circumstantial evidence are equally probative, and the latter alone can suffice to prove guilt. *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018).

### *Applicable Law*

As alleged in the indictment, to convict Wilbert of capital murder the prosecution had to prove that she employed Hardesty to murder Christine for remuneration or the promise of remuneration. TEX. PENAL CODE § 19.03(a)(3); *Hathorn v. State*, 848 S.W.2d 101, 114 (Tex. Crim. App. 1992). In this context,

remuneration is not confined to murder for hire; the concept encompasses more than payment or the promise of payment by a principal to an agent. *Rice v. State*, 805 S.W.2d 432, 434 (Tex. Crim. App. 1991). It includes any benefit, compensation, or reward given or agreed to for the death of the victim. *See id.* at 434–35; *Underwood v. State*, 853 S.W.2d 858, 860 (Tex. App.—Fort Worth 1993, no pet.). The focus is on the defendant's intent or state of mind, which may be proved through the testimony of others, such as accomplices. *See Rice*, 805 S.W.2d at 434–35.

*Analysis*

Wilbert does not dispute that the evidence suffices to prove beyond a reasonable doubt that Hardesty murdered Christine. Wilbert disputes that the evidence suffices to prove that she paid or promised to pay Hardesty to do so.

Several witnesses testified that Hardesty told them that Wilbert paid or promised to pay him to murder Christine. In particular:

- Driskell testified that Hardesty said that Wilbert hired him to kill a neighbor and told Driskell that Wilbert owed him money after he did so;

- Phillips testified that Hardesty said he was hired by a woman to kill a another woman, though Phillips did not know the terms of the agreement;

- Phillips also testified that Dutton told him that Hardesty accepted a contract to kill the woman for "Jo Ann," did so, and was paid; and

- Romel testified that Hardesty said that a woman hired him to kill another but did not pay him what he was owed before taking off to Florida.

14

Wilbert argues that the preceding testimony is not credible because it mostly consists of statements made by Hardesty, who has a reputation for untruthfulness. The jury, however, is the sole judge of witness credibility. *Balderas*, 517 S.W.3d at 766. Appellate arguments that depend on claims about witness credibility therefore "play no part in our review of the sufficiency of the evidence." *Id.*

Wilbert also argues that Hardesty's and Dutton's statements about payment lack the corroboration needed to constitute legally sufficient evidence. Her argument appears to be premised on the rule that a conviction cannot rest on "the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." TEX. CODE CRIM. PROC. art. 38.14; *see also Phillips v. State*, 463 S.W.3d 59, 66 (Tex. Crim. App. 2015) (accomplice testimony inherently unreliable and must be corroborated due to propensity for blame-shifting).

But "there is no requirement that the non-accomplice testimony corroborate the accused's connection to the specific element which raises the offense from murder to capital murder." *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007). In other words, "there need be only some non-accomplice evidence tending to connect the defendant to the crime, not every element of the crime." *Id.* "[T]he Court of Criminal Appeals has held such in cases in which the element raising murder to capital murder was remuneration." *Burleson v. State*, No. 01-11-00866-CR, 2013 WL 772947, at \*6 (Tex. App.—Houston [1st Dist.] Feb. 28, 2013, pet.

15

ref'd) (mem. op., not designated for publication) (citing *Anderson v. State*, 717 S.W.2d 622, 630–31 (Tex. Crim. App. 1986)). Thus, Hardesty's and Dutton's statements as to remuneration need not be corroborated by non-accomplice evidence to constitute legally sufficient evidence that Wilbert paid or promised to pay Hardesty to murder Christine. *See id.*

To satisfy article 38.14, all that is needed is that there be *some* non-accomplice evidence *tending to connect* Wilbert to the murder of Christine. *Joubert*, 235 S.W.3d at 731. Some non-accomplice evidence does so. Not least, Wilbert's purchase of the pistol that Hardesty used to murder Watkins, a short time before he did so, tends to connect Wilbert to the murder. Driskell testified that Wilbert bought Hardesty a pistol from a pawnshop. Undisputed records confirmed that Wilbert did buy a pistol. An expert concluded that this pistol was the murder weapon based on a comparison of bullets test fired from it and the bullets that were recovered from the autopsy. A rational jury could reasonably infer Wilbert's involvement from this evidence.

We further note that even if non-accomplice evidence corroborating remuneration was required by the law, the record contains some. Driskell testified that she participated in a telephone call between Hardesty and Wilbert. According to Driskell, Wilbert acknowledged that she still owed Hardesty money but stated that she did not want to pay him by wire or mail because these payments could be traced back to her. Wilbert's statement was an admission corroborating that she paid or

16

promised to pay Hardesty to murder Christine. *See Trevino v. State*, 991 S.W.2d 849, 852–53 (Tex. Crim. App. 1999) (witness's testimony as to defendant's statements admissible as admission of party).

Finally, Wilbert argues that Hardesty's and Dutton's statements are not legally sufficient evidence because they are hearsay unsupported by corroborating circumstances that clearly indicate their trustworthiness and thus inadmissible under the hearsay exception for statements made against penal interest. *See* TEX. R. EVID. 803(24); *Walter v. State*, 267 S.W.3d 883, 890–92 (Tex. Crim. App. 2008). This argument conflates admissibility and legal sufficiency. *See Moff v. State*, 131 S.W.3d 485, 490 (Tex. Crim. App. 2004) (claims of improper admission of evidence are distinct from claims of legal insufficiency). In a legal-sufficiency review, we consider all the evidence whether or not it was properly admitted. *Balderas*, 517 S.W.3d at 766; *see, e.g.*, *Deeb v. State*, 815 S.W.2d 692, 701–02 (Tex. Crim. App. 1991) (considering improperly admitted hearsay in legal-sufficiency review of capital murder conviction). We therefore reject Wilbert's argument.

We overrule Wilbert's challenge to the legal sufficiency of the evidence.

**Admissibility of Evidence of Racial Animus**

Wilbert contends that the trial court erred in overruling her objection to Horn's testimony that she referred to Christine using the slur "n*****." Wilbert maintains that this testimony was inadmissible evidence of a supposed character trait—racial

17

bigotry—offered solely to prove that she acted in accordance with that trait in hiring Hardesty to murder Christine. *See* TEX. R. EVID. 404(a).

### *Error Preservation*

Error preservation is not optional. *Darcy v. State*, 488 S.W.3d 325, 327–28 (Tex. Crim. App. 2016). We cannot reverse a conviction based on an error that is not preserved for our review even if the parties do not dispute error preservation. *Id.*

To preserve error as to the admission of evidence, a party must make a timely objection and secure a ruling from the trial court (or object to the trial court's refusal to rule if it refuses to rule). TEX. R. APP. P. 33.1(a); TEX. R. EVID. 103(a). An objection to a question is not timely if it is made only after the question is asked and answered, unless the party can show that there was a legitimate reason justifying the delay. *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008).

Subject to exceptions for continuing objections and evidentiary rulings obtained in hearings outside of the jury's presence, a party must object each time the ostensibly inadmissible evidence is elicited. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). Any evidentiary error is cured and thus presents no basis for reversal if the same evidence is admitted without objection at another point during the trial. *Lane v. State*, 151 S.W.3d 188, 192–93 (Tex. Crim. App. 2004).

*Analysis*

Defense counsel objected to the prosecution's inquiry as to what Wilbert said about Christine but only after Horn already had answered that Wilbert was "hateful" and "didn't want a black person around her." After the trial court overruled this objection, Horn testified more than once that Wilbert referred to Christine as a "n*****." Defense counsel did not renew his objection when Horn did so. Nor did defense counsel request a continuing objection to this line of testimony or a hearing outside the presence of the jury. During Horn's testimony, the prosecution also introduced into evidence a letter that Wilbert sent to Horn in which she referred to Christine as "the n*****." Defense counsel did not object to the admission of this letter.

Defense counsel's objection was untimely because he made it only after Horn had answered the question. *Luna*, 268 S.W.3d at 604. In addition, when Horn actually testified as to Wilbert's use of a racial slur to refer to Christine, defense counsel did not reassert the objection or secure a ruling from the trial court. Consequently, Wilbert did not preserve any error as to the admission of Horn's testimony. Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a); *Martinez*, 98 S.W.3d at 193. Moreover, Horn referred to Wilbert's use of this same racial slur at another point in his testimony—about Wilbert's letter—without objection. Thus, any ostensible error in the trial court's ruling was cured. *Lane*, 151 S.W.3d at 192–93.

We overrule Wilbert's challenge to the admissibility of Horn's testimony.

## CONCLUSION

We affirm the trial court's judgment.



Gordon Goodman
Justice

Panel consists of Chief Justice Radack and Justices Kelly and Goodman.

Do not publish. TEX. R. APP. P. 47.2(b).